# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTICT OF CALIFORNIA

**FILED**

JUN 1 1 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

Civil Case No; ……………………………………………

**C1 0-02577**

SAMUEL J. MAY, *ex rel.* on behalf of the

**UNITED STATES OF AMERICA,**

**FCA COMPLAINT,**

Plaintiff/Relator

**EXHIBITS A through O**

720 Bridge Creek Dr.

San Ramon, CA 94582

**FILED IN CAMERA AND**

Ph: 925-361-8550 (Home)

**UNDER SEAL**

760-809-4504 (Cell)

Email: sam.may@comcast.net

**JURY TRIAL DEMANDED**

v.

AMGEN, INC., a Delaware Corporation,

Defendant

## QUI TAM COMPLAINT

### PURSUANT TO 31 U.S.C §§ 3729-3732 OF THE FEDERAL FALSE CLAIMS ACT

The United States of America, by and through *qui tam* Relator SAMUEL J. MAY brings this action under 31 U.S.C §3729, *et seq.*, (or "False Claims Act") to recover all damages, penalties and other remedies established by the False Claims Act on behalf of the United States, and alleges as follows:

FCA Recovery Complaint                    1

# TABLE OF CONTENTS

TITLE PAGE...................................................page 1

I.      PRELIMINARY STATEMENT.......................page 3

II.     SUMMARY INTRODUCTION.......................page 5

III.    FACTUAL BACKGROUND..........................page 14

IV.     PARTIES........................................page 21

V.      JURISDICTION & VENUE...........................page 24

VI.     APPLICABLE STANDARD OF LAWS..............page 25

VII.    FACTUAL ALLEGATIONS...........................page 33

VIII.   CAUSE OF ACTION....................................page 54

IX.     PRAYER FOR RELIEF.................................page 64

X.      DEMAND FOR JURY...................................page 65

CERTIFICATE OF SERVICE...............................page 66
        SERVICE LIST.....................................page 66

## EXHIBITS A through O

# I. PRELIMINARY STATEMENT

1.      This is an action to recover damages and civil penalties on behalf of the United States of America, for violating the False Claims Act ("FCA") arising from false or fraudulent records, statements, or claims, or any combination thereof, made, used or caused to be made, used, or presented, or any combination thereof, by the defendant, their agents, employees, or co-conspirators, or any combination thereof, with respect to reverse false claims resulting from non-conforming products or reports submitted to the United States Centers for Medicare and Medicaid Services (or "CMS"), and the United States Food and Drug Administration (or "FDA") for fraudulent scheme to set and maintain inflated prices for  manufacturing Erythropoietin Stimulating Agents (or "ESAs"), specifically, ARANESP and EPOGEN,  prescribed to treat Anemia, End Stage Renal Disease (or "ESRD") for which False Claims were made, and the Government eventually paid for non-conforming, tainted or adulterated products.

2.      The False Claims Act or Lincoln law was enacted during the Civil War. Congress amended the FCA in 1986 and again in May 2009 to enhance the Government's ability to recover economic losses sustained as a result of fraud, abuse or waste against the United States. Congress characterized such amendments as the primary tool for combating Government fraud.

3.      Congress intended these amendments create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or Government inaction, and to encourage citizens to prosecute fraud on Government's behalf.

4.      The FCA provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the U.S. Government for payment or approval is liable for a civil penalty of up to $10,000 for each such claim, plus three times the amount of the damages sustained by the Government.

FCA Recovery Complaint                         3

5.     All Biopharmaceutical[1] (or "Biopharma") manufacturers are subject to extensive regulations by the federal government, principally the FDA and CMS for reimbursements. The Federal Food, Drug and Cosmetic Act, (or "FDCA") passed in 1938, and applicable 21 CFR Parts 600-680 regulations govern or influence, among other things, the development, testing, manufacture, safety, labeling, storage, recordkeeping [sic], approval, advertising, promotion, sale, and distribution of Biopharma products in the US.

*Additionally, Biopharma manufacturers are also subject to accurate record keeping and reporting, establishment registration, product licensing, and FDA inspections.*

6.     Section 351 of the Public Health Service Act (PHS Act), 42 USC § 262 - Regulation of biological products - Biological and related products include blood, vaccines, allergenics, tissues, and cellular and gene therapies. Biologics, in contrast to drugs that are chemically synthesized, are derived from living sources (such as humans, animals, and microorganisms).

*They must be identified or well characterized[2] according to existing general regulations[3], during manufacturing using biotechnology process according to CBER, a Center within the FDA. Any violation (Safety and Efficacy) of biologics manufacturing shall subject the violator to a civil penalty of up to $100,000 per day of violation.*

7.     The FCA will allow any person having information about a false or fraudulent claim against the Government to bring an action for himself and the Government, and to share in any recovery. The Act requires that the complaint be filed under seal for a minimum of 60 days

---

[1]   A pharmaceutical product manufactured by biotechnology methods in specialized facilities (involving live organisms; bioprocessing) and is used to prevent, treat, cure, diagnose, and mitigate diseases. AMGEN uses recombinant DNA of Chinese Hamster Ovary (CHO) cells to manufacture ARANESP and EPOGEN purified bulk protein.

[2]   Evidence for identity, purity, and stability of the product in comparison with reference preparations may be derived from the results of a wide variety of tests. The specific tests that will adequately characterize any particular product on a lot to lot basis will depend on the nature of the product.

[3]   Center for Biologics Evaluation and Research (CBER) determined, 21 CFR 200 et seq. and 21 CFR 600 et seq. and especially 21 CFR 610.18 and 601.12 et seq. embody requirements with objectives that the final product be uniform, consistent from lot-to-lot and free from adventitious infectious agents.

1  (without service on the defendant during that time) to allow the Government time to conduct its

2  own investigation and to determine whether to join this suit.

# II. SUMMARY INTRODUCTION

6  8.      This action is brought by qui tam Relator Samuel J. May (or "Relator"), on behalf of the

7  United States, against Defendant AMGEN Inc. ("AMGEN" or "defendant") to recover penalties

8  and damages arising from false statements, false certifications, false manufacturing costs,

9  fraudulent and deceptive scheme to inflate prices, distributing non-conforming, tainted, or

10 adulterated ARANESP and EPOGEN Filtered Bulk Protein ("FBP")[4] under FDCA, and causing

11 a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money

12 or property to the Government, and causing severe public harm.

14 9.      Relator brings this action to recover treble damages and civil penalties under the FCA for

15 violating FDA laws, defrauding CMS, unjust enrichment, and in violating his protected rights as

16 a whistleblower under FEDERAL statutes including COLORADO and CALIFORNIA

17 Whistleblower Laws, and for retaliating against him for disclosing and refusing to participate in

18 illegal and unethical activities regarding the testing, reliability, security, accuracy and reporting

19 of validation study results of ARANESP and EPOGEN manufacturing.

21 10.     AMGEN knowingly delivered non-conforming, tainted, or misbranded ARANESP and

22 EPOGEN biological products, and knowingly failed to implement and enforce a compliant

23 Quality Assurance program ("QA"). Accordingly, genuine issues of fact exists that (1) AMGEN

24 knowingly delivered non-conforming and harmful products, (2) knowingly failed to implement

---

[4]   ARANESP and EPOGEN ("Protein of Interest") purification is a series of chemical processes
intended to isolate a single type of protein (ARANESP or EPOGEN) from a complex mixture. Their
purification is vital for the characterization of the function, structure and interactions of the protein of
interest. Separation steps of ARANESP or EPOGEN from all others exploit differences in protein size,
physico-chemical properties and binding affinity.

FCA Recovery Complaint                              5

1   and enforce compliant QA[5], Validation programs, , (3) knowingly made false statements to the

2   FDA and CMS in complying with regulatory commitments, (4) knowingly excluded an

3   important validation study tracking database used in controlling FDA's licensing agreements, (5)

4   knowingly ignored FDA commitments to complete manufacturing validation studies within 45

5   days as agreed, (6) knowingly, intentionally, illegally promoted, ARANESP and EPOGEN with

6   company employees for indications ("improve quality of life") not approved by the FDA (Off-

7   Label), and (7) knowingly and intentionally retaliated against Relator for putting AMGEN's

8   management on notice for unlawful actions.

9

10   11.   Mr. Samuel J. May (or "Relator") was hired beginning 2002 as a Validation Specialist for

11   validating computer systems and later included tracking open validation studies[6] utilized by

12   AMGEN to maintain FDA licensing agreements. Within 5 weeks after being hired Relator was

13   reclassified as Computer Validation Engineer III based on his superior performance and growing

14   accolades. During the next two years he received glowing reviews and commensurate bonus,

15   awards, merit and salary increases.

16     11.1   In early 2005, Relator discovered several outstanding validation studies (Backlog

17     studies) that were stored in a discretely hidden validation tracking database (FM Pro db)[7]

18     amounting to over 214 studies beginning from 1999 through 2005 including several

19     incomplete ARANESP and EPOGEN studies as required by FDA.

---

[5]   A failure to find other cases where a False Claims Act (FCA), 31 U.S.C.S. § 3729 et seq., violation was based on quality assurance problems does not translate into a blanket rule that there is never liability under the FCA for quality assurance problems. United States ex rel. Jordan v. Northrop Grumman Corp., 2002 U.S. Dist. LEXIS 26622 (C.D. Cal., Aug. 5, 2002)

[6]   Validation studies are performed to demonstrate that a system or a process does what it is intended to do in a reliable fashion and in a state of control, which results consistently in meeting pre-determined specifications. FDA also defines validation protocols as "Documented evidence of testing approved to predetermined specifications and acceptance criteria".

[7]   FileMaker Pro is a commercial off-the-shelf (COTS) data management system, easy-to-use as relational database software used by small teams at AMGEN to track validation studies and projects to completion. Commonly used by many people in business, government, and education to effortlessly manage all their information (Tasks, reports, projects, tracking, status) on standard office network platforms.

FCA Recovery Complaint     **6**

12.     He took this spearheading assignment and created a proactive approach (See Exhibit A –
PQ/PV Study process flow chart) collaborating with validation and process engineers in
successfully tracking few protocols to completion according to AMGEN and FDA approved
procedures.  Relator was the only one tracking closure of these protocols or studies using the
Validation tracking database.  As such he was privy to intimate details concerning the failures
and unlawful shortcuts schemed to falsely certify the ARANESP and EPOGEN manufacturing as
pure drug.  His unique expertise combining biologicals, medicine, and public health, computers
and business financials enables thorough investigative details.

13.     Relator, in good faith, disclosed to AMGEN'S senior management the existence of
improper validation protocols/studies[8] being reported to the FDA, violations of established
ethical standards concerning the recording and reporting of validation data, failure to follow
proper closure of protocols when reporting drug study data, and violations of policies and
procedures established to safeguard drug manufacturing and consumers of biological products.

14.     Initially, Relator's disclosures were encouraged by his immediate superiors.  After he
expressed concern that the backlogged validation problems were more extensive [sic], however,
his supervisors informed him not to worry; they were "out of scope" and not to inquire any
further with others. When Relator refused to "go with the flow" and tried to do the right thing as
was expected at AMGEN, his job was reassigned, harassed for not being a team player, and
written up for insubordination.

15.     Defendant arranged for several internal Sales and Marketing Managers on many
occasions, who knowingly made false statements while showing and coercing video clips of
staged consumer stories to boost "Quality of Life" claims, to manufacturing and operational
personnel on several occasions in mass company meetings called "All site meetings". These

---

[8]   Proper closure and approvals according to AMGEN predetermined specifications and acceptance
criteria would demonstrate to a high degree of assurance that ARANESP and EPOGEN FPB are safe and
efficacious for product distribution and ultimately for human use.

FCA Recovery Complaint                      7

meetings were intended to spread the dramatic changes ESA's were providing for indications other than legally approved at higher hemoglobin levels.

16.    Relator upon believing such off label statements and coercive stories from AMGEN managers encouraged his diabetic mother, not requiring dialysis, to seek ARANESP treatments causing her untimely death. In response to Relator's internal complaints and in retaliation for his refusal to take part in AMGEN'S illegal activities and violations of public policy, he was, harassed, threatened, called trouble maker, his transfer to another AMGEN facility blocked, created oppressive work conditions, and ultimately forced out his employment at AMGEN.

17.    After job withdrawal, he resigned his employment at AMGEN under protest, citing many of the fraudulent acts and misrepresentations giving rise to this legal action. Relator then continued to suffer disparaging remarks passed from AMGEN employees and reported these *de facto* violations to the US FDA beginning March through September 2007, submitting details and evidence pertaining to AMGEN'S unlawful actions, and misconduct schemed to defraud the FDA including CMS.

18.    SUSPECTED, ADULTERATED PRODUCT DISTRIBUION

Beginning in at least 2001 and continuing through 2008 for ARANESP, and 1999 through 2008 for EPOGEN, AMGEN illegally took shortcuts by manufacturing, distributing suspected impure, and non-conforming ARANESP and EPOGEN FPB (the period "1999 though 2008") products to medical providers and Large Volume Purchasers causing them to pay for non-conforming or tainted products and got enriched through the CMS reimbursement program unlawfully.

19.    AMGEN continued to knowingly violate several FDCA statutes (or "CGMP")[9], including 21 CFR Part 11 (or "Electronic records"), 21 CFR 601.12 (FDA Licensing agreements),

---

[9]   Current Good Manufacturing Practice (CGMP) regulations, include 21 CFR Part 210, CGMP in Manufacturing, Processing, Packing, or Holding of Drugs; General and 21 CFR Part 211, CGMP for Finished Pharmaceuticals. 42 USC § 262. Regulation of biological products is also applicable.

1   including 42 USC § 262 - Regulation of biological products even after FDA inspectors, Relator,

2   and other Consultants put AMGEN managers on notice. Many such CGMP violations were to

3   due to lacking resources, subject matter experts, and in absence of critical decision making

4   managers to supervise ARANESP and EPOGEN manufacturing assurance as they were

5   constantly being reassigned between two facilities (Longmont & Boulder).

6

7   20.   AMGEN also willfully and intentionally misrepresented to the FDA inspectors (Robert

8   Tollefson and Paula Trost) who questioned them on several continuing unlawful practices and

9   CGMP violations. AMGEN again agreed to correct these gross deviations in subsequent

10  regulatory commitments (See Exhibit B – AMGEN 2004 response to 483 and Tillet Letter) but

11  failed to comply as shortage of personnel and QA enforcements demised. AMGEN knowingly

12  distributed suspected, con-conforming, impure, misbranded or adulterated products to Large

13  Volume Purchasers ("LVPs") in order to increase its unjust product sales year over year.

14

15  21.   HIDING VALIDATION PROTOCOLS OR STUDIES

16  Beginning in at least 2002 and continuing, AMGEN purposely failed to identify a discrete

17  Validation Tracking Database ("VTS or FM Pro")[10], and include it in AMGEN's 21 CFR Part 11

18  program ("Part 11") in order to comply with its own, and FDA requirements.  An inventory of

19  systems conducted to include all Computer related systems supporting ARANESP and EPOGEN

20  manufacturing at the Colorado facilities intentionally excluded this VTS.  This unsecured

21  discrete system was used to manage Validation documents status, tracking, approvals, product

22  run results, adherence to schedule and metric reporting with consistent errors.

---

[10]   FileMaker Pro is a commercial off-the-shelf (COTS) data management system, easy-to-use as
relational database software used by small teams at AMGEN to track validation studies and other projects
to completion. Many people in business, government, and education use FileMaker Pro to effortlessly
manage all their information (Tasks, reports, projects, status) on standard network platforms. Part 11
applies to electronic records that are created, modified, maintained, archived, retrieved, or transmitted
under any FDA records requirement; therefore, this system must be validated to ensure authentication and
integrity of record management.  AMGEN, in practice to support ARANESP and EPOGEN
manufacturing utilized three instances of this relational database to control (1) Validation document
tracking, (2) V-Status, and (3) Tasks management in Colorado.

FCA Recovery Complaint                    9

22.    This database was excluded from AMGEN's validation program[11] while it was used to submit management reports, track study initiation and completions dates, and provide status according to the 45 day closure rates (See Exhibit C – FM Pro plan Email ) to internal and external senior executives including the FDA. Data tracked and controlled by this system was also used to update FDA for required Annual Product Evaluation reports for ARANESP and EPOGEN according to FDA's licensing agreements.

23.    Executives managers proposed company wide goals to encourage fraud, abuse and waste, and deliberately attempted to conceal compliant manufacturing processes. For several years, corporate goals in the company consisted of reducing required costs and pushed for being "NIMBLE" which was loosely defined to take unjust or unlawful shortcuts to release ARANESP and EPOGEN lots for distribution. Those participating were induced with alcohol parties, cash bonus, stock options, promotions, and other financial incentives including liberal time off.

24.    In certain studies Performance Qualification/Process Validation studies ("PQ/PV Protocols"), 45 day clock began to run when pre-determined studies received pre-approvals to execute such studies from Validation and QA personnel in the manufacturing environment. These studies were contingent to be completed regardless of process research activities to properly control the required filtered purified process of commercial scale manufacturing of ARANESP and EPOGEN. This proactive program was implemented by Relator to ensure AMGEN complied with the provisions of its licensing requirements. See Exhibit A - PQ/PV Study process flow chart Implemented by Relator for concurrent studies.

---

[11]  Part 11 & FDA Validation requirement at AMGEN- Incorporating the necessary functionality required for Part 11 compliance is arguably the design steps. "Validation" is a process through which all system functions are documented and proven. This is an exhaustive undertaking that extends well beyond the average scope of development. It involves a system development lifecycle of assessments (gap analysis); Current Good Manufacturing Practices (CGMP); Installation, Operational, and Performance Qualification (IQ, OQ, and PQ); Change Control management; auditing of software development and implementation processes; thorough documentation; training; and more.

FCA Recovery Complaint          10

1    25.    Another instance of the said FM Pro database was also used to track Validation Status

2    ("V-Status")[12] of manufacturing lots when issues were encountered while executing pre-

3    approved validation protocols or studies. Several ARANESP or EPOGEN FPB lots

4    manufactured under non-conforming standards were NOT tagged for V-status and tracked for

5    proper completion[13]. This required activity was often skipped or reported with errors.

6

7    26.    In sum and substance as demand for ARANESP and EPOGEN usage increased, AMGEN

8    schemed to shuffle key decision making managers responsible to oversee the manufacturing

9    process and yield calculations[14] and placed them in other areas of the two facilities in Colorado.

10   Among others, such shuffling occurred when the heads of Validation and QA departments left

11   the company abruptly, it took years to backfill these positions while inexperienced employees

12   were ordered to release non-conforming products to interstate distribution.

13

14   27.    Inflated yield rates of ARANESP and EPOGEN bulk proteins were then packaged for

15   meeting market demands. Lack of resources and poor QA oversight are also violations of the

---

[12]   The V-Status system assures that concurrent process and cleaning validation associated with a product lot is reviewed prior to intermediate commercial drug product disposition and completed (i.e. report approved) prior to final drug product lot disposition. Information used to compile the list of validation studies that impact the V-Status state of a given product lot is maintained in the Validation Tracking database (FM Pro relational database).

[13]   The purpose of the V-status is to determine if any validation tests and sampling failed acceptance criteria and if that failure could potentially have an impact to the releaseability of a lot. If for example, buffer hold sample failed a key performance parameter (e.g. bioburden) that compromised buffer could have been used during production and a thorough investigation would need to be initiated to determine if there is any impact to the product lot. In this situation the lot is tagged as V status until all testing study is complete or justified. In many cases lots get released to distribution assuming risk and hoping they don't have to recall the lots while it investigates. The open protocols are one way of determining this very risky practice in maintaining conformity.

[14]   In a response to FDA's observation in June 2004, AMGEN revised SOP P601184, Process Validation at Amgen Colorado Manufacturing Facilities (effective July 2, 2004; Attachment 1) to add the requirement that acceptance criteria for actual lot yields be established in process validation protocols at the last step of fermentation/recovery and bulk fill. Amgen revised this SOP P601184, to require that actual lot yields be included as acceptance criteria in future validation protocols. It stated Control limits for actual lot yield will be determined, and will be applied as process monitoring parameters for all future lots for all products including ARANESP and EPOGEN.

FCA Recovery Complaint                    11

1    FDCA requiring management to provide sustainable employee resources.  These issues [sic]

2    were also consistently noted by FDA inspectors.

3         - During an inspection closing meeting, FDA's Robert Tollefson, urged AMGEN

4         management to "*I ask that you ask yourselves, if your Quality Organization has strong*

5         *enough oversight*".

6    It has now become clear that poor capital allocation, expense control, week oversight of

7    operating risks, and unlawful increases in production output of ARANESP and EPOGEN has

8    greatly contributed to the overuse of ESA's causing unjust enrichment.

9

10        ## RECENT ESAs DEVELOPMENTS (FDA and CMS) SINCE RELATOR

11        ## NOTIFIED THE US FDA

12   28.    On or about March 9, 2007, the FDA issued a black box warning[15] for ARANESP, the

13   most serious warning available on a drug's label, due to increased risk for death, of serious

14   cardiovascular or thromboembolic events, and more rapid tumor progressions. The new warning

15   cautioned physicians to administer the lowest dose possible in order to bring red blood cell

16   counts to the lowest level necessary to avoid blood transfusions.

17

18   29.    The black box warning described the results of six clinical studies which demonstrated

19   that survival was shorter and tumors progressed faster when used to achieve hemoglobin levels

20   of 12 g/dL of blood or greater in cancer patients.  AMGEN was completely aware of the non-

21   conforming manufacturing standards but yet did not rectify the clinical trials properly (See

22   Exhibit D- FDA News, ESAs Safety notice - March 9, 2007).

23

---

[15]  A black box warning means that medical studies indicate that the drug carries a significant risk of
serious or even life-threatening adverse effects. The U.S. FDA required AMGEN to place a black box
warning on the labeling of ESAs, or in literature describing it. It is the strongest warning that the FDA
requires for alerting prescribers.

FCA Recovery Complaint                         12

1    30.    On or about November 8, 2007, the FDA approved revisions to prior black box warnings,

2    which expanded the labeling changes made in March 2007, to provide specific dosing

3    information.  The revised black box warning stated that dosing should be individualized to

4    "*achieve and maintain hemoglobin levels within the range of 10 to 12 g/dL*".

5

6    31.    For kidney patients, the revised warning read that: "*patients experienced greater risks for*

7    *death and serious cardiovascular events when administered ESAs to target higher versus lower*

8    *hemoglobin levels*". For cancer patients, the new warnings emphasized that ARANESP could

9    cause tumor growth and shorten survival among patients with advanced breast, head and neck

10   lymphoid tumors, and non-small cell lung tumors (See Exhibit E – Black box finalized by FDA

11   Nov 8, 2007).

12

13   32.    Additionally, FDA mandated expanded black box warnings for ESAs relating to two

14   more clinical studies that concluded there was increased risk of death and faster tumor growth

15   when administered to target a hemoglobin level of 12 g/dL in cancer patients' not receiving

16   chemotherapy or radiation therapy.

17       32.1   This revised black box warning clarified that ARANESP should only be used in

18       cancer patients with anemia specifically caused by chemotherapy, not for other causes of

19       anemia. AMGEN and J&J also issued a "Dear Healthcare Provider Letter" to medical

20       providers advising of the revised ARANESP labeling (See Exhibit F – Dear Healthcare

21       letter, dated April 8, 2009).

22

23   33.    On February 16, 2010, AMGEN and Centocor Ortho Biotech Products, L.P., a subsidiary

24   of J&J, announced that the FDA approved Risk Evaluation and Mitigation Strategy (or "REMS")

25   for ESAs which includes ARANESP, EPOGEN, and PROCRIT. As part of the REMS, a

26   medication guide explaining risks of Erythropoietic-Stimulating Agents (or "ESAs") must be

27   provided to all patients receiving them.

28       *"In addition, the ESA APPRISE ("Assisting Providers and cancer Patients with Risk*

29       *Information for the Safe use of ESAs") Oncology Program was established as a part*

FCA Recovery Complaint                          13

1    *of the ESA REMS.  FDA has determined that REMS is necessary for ESAs to ensure*

2    *the benefits of these drugs outweigh the risks of shortened overall survival ("OS") and/or*

3    *increased tumor progression or recurrence as identified in clinical studies in patients*

4    *with breast, non-small cell lung, head and neck, lymphoid and cervical cancers".*

5    (See Exhibit G – REMS final notice approved by FDA on Feb 16, 2010)

6

7    34.    In order to ensure continued access to ESAs for healthcare providers who prescribe and

8    dispense, ESAs to patients with cancer, providers are required to train and enroll in the ESA

9    APPRISE Oncology Program by February 15, 2011 and to document that a discussion about the

10   risks of ESAs took place with each patient prior to the initiation of each new course of ESA

11   therapy. This ESA APPRISE Oncology Program was launched on March 24, 2010.

12         34.1    Also, on this same date, CMS held a Medicare Evidence Development &

13         Coverage Advisory Committee (or "MEDCAC") meeting to review the available

14         evidence on the use of ESAs to manage anemia in patients who have chronic kidney

15         disease ("CKD"). AMGEN is awaiting decisions about coverage and reimbursement

16         policies for ESAs in patients with CKD.

17

18   35.    Mr. May has complied with all other conditions precedent to bringing this action by

19   properly notifying the Government of AMGEN's fraudulent scheme, deceptive, and unlawful

20   activities.

21

22                    # III. FACTUAL BACKGROUND

23

24                    ARANESP (or "Darbepoetin alfa")

25   36.    ARANESP is an injectable protein that stimulates red blood cell production, specifically

26   to increase hemoglobin levels, so to avoid the need for blood transfusions in patients

27   experiencing kidney failure or chemotherapy-induced anemia. AMGEN manufactures it in the

28   US and markets it as a revolutionary product (Erythropoiesis-Stimulating Agent – ESA)

29   primarily in the United States and Europe.

FCA Recovery Complaint                    14

37.     ARANESP was approved by the FDA on or about September 17, 2001 with mandatory post market approvals for treatment of Anemia associated with chronic renal failure.  On or about July 17, 2002, FDA expanded ARANESP's indication to include the treatment of chemotherapy-induced anemia in patients with non-myeloid malignancies.

38.     The licensing provisions required AMGEN to provide authenticated Validation studies and were binding upon ongoing compliance requirements to manufacture under approved conditions. Bulk ARANESP was primarily manufactured in Longmont, Colorado, and formulation & fill/finish in Puerto Rico until 2007 but is now entirely manufactured and packaged at its subsidiary, AMGEN Manufacturing Limited in Puerto Rico ("AML").

> *"AMGEN relies largely on reimbursements from CMS programs to recuperate its reasonable manufacturing costs consisting of bulk manufacturing, formulation, fill and finish and distribution activities for ARANESP".*

39.     CMS's Medicare and Medicaid ("M&M") payment policies for biologicals are subject to various laws and regulations. The M&M program covers ARANESP when administered in the physician clinic setting and the hospital outpatient and dialysis settings, under Part B, and reimburses providers using a payment methodology on a fixed percentage of ARANESP Average Sales Prices (or "ASP")[16].

40.     ASP is calculated by AMGEN; accounting for Average Manufacturer Price (or "AMP") and BEST PRICE (or "BP")[17] based on a statutorily defined formula and is submitted to CMS. ASP and BP are to be calculated reasonably and reported to CMS quarterly and now on monthly basis and therefore may change each quarter. ARANESP receives higher reimbursement costs

---

[16]   AMGEN must use Generally Acceptable Accounting Practices (GAAP) to determine cost of sales and Cost Of Goods Manufactured (COGM) to accurately publish its ASP with Assumptions.

[17] "BEST PRICE" or "BP" is defined as the lowest price the manufacturer sells the covered outpatient drug to any purchaser in the United States. When determining the BEST PRICE, manufacturers must include cash discounts, free goods, volume discounts, and rebates given on the covered drug. 42 U.S.C. §§ 1396r-8(c) (i)–(iii).

FCA Recovery Complaint                    15

1   per unit than EPOGEN based on aggregate usage and CMS billing.  Therefore, manufacturing

2   ARANESP fraudulently [sic] provides greater incentives while supporting the unlawful

3   marketing campaigns.

4

5   **40.1   January 2005 Payment Allowance Limits for ARANESP and EPOGEN**

6   **Effective January 1, 2005 through March 31, 2005**

| HCPCS Code | Short Description | HCPCS Code Dosage | Payment Limit |
|---|---|---|---|
| J0881 | Darbepoetin alfa, non-ESRD | 1 MCG | $3.354 |
| J0882 | Darbepoetin alfa, ESRD use | 1 MCG | $3.354 |
| J0885 | Epoetin alfa, non-ESRD | 1000 UNITS | $9.332 |
| J0886 | Epoetin alfa, ESRD on dialysis | 1000 UNITS | $9.283 |

7

8   41.   The ASP in effect for a given quarter is based upon certain historical sales and sales

9   incentive data covering a statutorily defined period of time preceding the Current Period. CMS

10  publishes the ASPs for products in advance of the quarter in which they go into effect. Section

11  1847A(c) (2) of the Act requires manufacturers to exclude from the calculation of ASP those

12  sales that are exempt from the Medicaid BP calculation. In the calculations of ASP/AMP/BP,

13  CMS currently allows AMGEN to make reasonable assumptions[18] consistent with customary

14  business practices.  The deceptive scheme of inflating manufacturing costs is now exposed.

15

16  42.   Aggregate Sales of ARANESP obtained from AMGEN's public filings amounted to over

17  $12 Billion dollars from 2001 through 2009. Greater than half of these amounts were obtained

18  from CMS reimbursements funded with American tax payers and businesses. Until recently,

---

[18]   In the absence of specific guidelines, AMGEN is to make reasonable assumptions in its calculations of ASP, consistent with the general requirements and the intent of the Social Security Act, Federal regulations, and its customary business practices. AMGEN must include assumptions in their ASP submissions.

FCA Recovery Complaint                16

ARANESP sales in the US had increased steadily with poor capital allocation, expense control, and weak oversight of operating risk year over year as follows:

### 42.1   Total US Sales reported for ARANESP

| Year | ARANESP Total Revenues |
|------|------------------------|
| 2001 | $ 27 Million |
| 2002 | $ 285 Million |
| 2003 | $ 980 Million |
| 2004 | $ 1.533 Billion |
| 2005 | $ 2.104 Billion |
| 2006 | $ 2.79 Billion |
| 2007 | $ 2.154 Billion (Decreased 23%) |
| 2008 | $ 1.65 Billion (Decreased 23%) |
| 2009 | $ 1.25 Billion (Decreased 24%) |

## EPOGEN & PROCRIT (or "Epoetin alfa")

43.    Long before ARANESP was approved as ESA, on or about September 1985, AMGEN contracted with a subsidiary of Johnson and Johnson, Ortho Pharmaceutical Corporation (J&J), for financial and technical assistance in completing the development of, and FDA approval for Epoetin alfa, an ESA designed to prevent need for blood transfusions. FDA approved Epoetin Alfa on or about June 1989 and is a protein injectable that stimulates red blood cell production while competing with ARANESP in the market place.

*Under contract with AMGEN, J&J must also pay AMGEN royalties on its net sales of PROCRIT in the United States. These agreements are based on AMGEN manufacturing Epoetin Alfa under FDA approved and J&J compliance requirements. AMGEN settled lawsuit with J&J who alleged various antitrust laws, bundling practices, including several lots of Procrit recall (July 2008).*

44.    Aggregate Sales of EPOGEN obtained from AMGEN's public filings amounted to over $25 Billion dollars from 1999 through 2009. Greater than half of these amounts were obtained from CMS reimbursements funded with American tax payers and businesses. EPOGEN sales in

FCA Recovery Complaint                    17

1   the US had increased steadily with poor capital allocation, expense control, and weak oversight

2   of operating risk year over year as follows:

3   **37.1    Total US Sales reported for EPOGEN**

| Year | Epoetin Alfa Revenue |
|------|----------------------|
| 1999 | $ 1.76 billion |
| 2000 | $1.96 billion |
| 2001 | $2.11 billion |
| 2002 | $ 2.26 billion |
| 2003 | $ 2.44 billion |
| 2004 | $ 2.60 billion |
| 2005 | $ 2.46 billion |
| 2006 | $ 2.51 billion |
| 2007 | $ 2.49 billion (Decreased 1%) |
| 2008 | $ 2.46 billion (Decreased 1%) |
| 2009 | $ 2.57 billion |

4

5   ## CALIFORNIA AND COLORADO MANUFACTURING

6   **45.**    About 2001, AMGEN was inspected in Thousand Oaks (ATO) part of the Biennial

7   inspections and were cited heavily (~ 40+ observations) resulting in a 483 for EPOGEN

8   manufacturing. Some of the observations included causes to upgrade technology (Computer

9   systems, Equipment & related Manufacturing systems) and quality Assurance/Control Staff.

10   AMGEN's response to this 483 also included AMGEN's commitments to complete validation

11   studies in a timely manner (Specifically, to close validation protocols within 45 days of obtaining

12   pre-approvals and/or study dates).   See Exhibit I - 45 Day Validation Protocol commitments.

13

14   **46.**    AMGEN agreed that when studies required longer time to complete they would be

15   justified and approved prior to ARANESP and EPOGEN distribution to consumers. Standard

16   Operating Procedures (SOPs) were developed in Amgen Thousand Oaks (ATO - SOP P0300-33)

17   and in Amgen Colorado (ACO - SOP P601118) when ARANESP received FDA approval in

18   September 2001 to be manufactured in the Colorado Longmont Facility. There are two

19   manufacturing facilities in Boulder and Longmont, Colorado.

FCA Recovery Complaint                 18

1   Longmont facility is dedicated to manufacturing Filtered Purified Bulk ("FPB")[19] ARANESP

2   and EPOGEN using mammalian ("CHO") cells.  Resources, materials, and personnel were

3   shared by both sites.

4

5   47.    This regulatory commitment was put in place so that shortcuts or violations to

6   manufacturing standards would be avoided while promoting good science, basic quality

7   assurance, and licensing agreements.  In the Colorado Longmont ARANESP and EPOGEN

8   manufacturing facility, a simple Commercial-Off –The Shelf (COTS) File Maker Pro (FM Pro)

9   database was identified to track all validation protocols/studies. This relational database was also

10  to track and enforce the 45 day required studies in order to comply with FDA requirement, and in

11  providing status and progress reports as designed by then head of validation department. See

12  Exhibit C - FM Pro Database Validation Meeting, Email correspondence from Nancy Johnson

13

14  48.    This critical tracking database was subject to FDA's 21 CFR Part 11[20] requirements for

15  validation and maintenance authenticating records repository. The  regulatory 45 day time

16  restraints accepted by the FDA as proposed by AMGEN, was intended to discourage unlawful

17  changes or increases in yield rates of the products (over produce) without seeking further FDA

18  approvals (Changes to Be Effected-CBE's, Comparability protocols).

19

---

[19]   ARANESP and EPOGEN ("Protein of Interest") purification is a series of chemical processes
intended to isolate a single type of protein (ARANESP or EPOGEN) from a complex mixture. Their
purification is vital for the characterization of the function, structure and interactions of the protein of
interest. The starting material is a biological tissue ("CHO" cells). The various steps in the purification
process may free the protein from a matrix that confines it, separate the protein and non-protein parts of
the mixture, and finally separate the desired protein from all other impurities. Separation of one
ARANESP or EPOGEN from all others is typically the most laborious aspect of protein purification.
Separation steps exploit differences in protein size, physico-chemical properties and binding affinity.

[20]   21 CFR Part 11 covers Food and Drugs, while CFR Title 45 covers Public Welfare. 21 CFR Part 11
(referenced in this document as "Part 11"); "Electronic records; electronic signatures" Both Titles 21 and
45 include regulations controlled by the Department of Health and Human Services (DHHS), however,
Part 11 of Title 21 is specific to the FDA. Part 11 applies to electronic records that are created, modified,
maintained, archived, retrieved, or transmitted under any FDA records requirement; therefore, any such
system must be validated to ensure authentication and integrity of record management at AMGEN.

49.     This technology transfer from AMGEN Thousand Oaks facility to manufacture
ARANESP was critical because AMGEN was using a newly approved facility for ARANESP in
ACO, where concurrent EPOGEN was also being manufactured via alternating campaigns for
both products requiring competent changeover[21] and cleaning validation assurance.  In effect,
supporting computer related systems were also to be compliant at all sharing sites including the
Fm Pro database. See Exhibit C - FM Pro Database Validation Meeting, Email correspondence
from Nancy Johnson.

50.     Adherence to schedule as coined by Colorado management was very visible at ACO
driven by resource requirements, lowering the cost of goods manufactured[22] (COGM), increasing
purified product yields, and accurately projecting capacity planning to meet persistent market
demands, while senior mangers in Colorado constantly complained about lack of head counts.

51.     After AMGEN submitted Biologics License Application (or "BLA")[23] for ARANESP,
FDA inspected the Longmont facility in 2001 ("Pre-approval inspection"), it was again observed,

---

[21]    Under §§ 601.12 and 314.70(g), a change to a product, production process, quality controls,
equipment, or facilities is required to be reported to FDA in: 1) a supplement requiring approval prior to
distribution; 2) a supplement at least 30 days prior to distribution of the product made using the change;
or 3) in an annual report, depending on its potential to have an adverse effect on the identity, strength,
quality, purity, or potency of the product as they may relate to the safety or effectiveness of the product.
Before distributing a product made using a change, the regulations require applicants to demonstrate,
through appropriate validation and/or other clinical or non-clinical laboratory studies, the lack of adverse
effect of the change on the identity, strength, quality, purity, or potency of the product as they may relate
to its safety or effectiveness.

[22]    Cost of goods manufactured (COGM) is the manufacturing costs associated with the goods that were
finished during that period. It takes into reasonable accounts how AMGEN utilizes to calculate AMP,
ASP, and AWP and reports to CMS and other parties of interest. Earnings Before Interest, Taxes,
Depreciation, and Amortization (EBITDA) is used as a surrogate measure of a company's cash flow from
operations.

[23]    Application to the US FDA to begin marketing specific sorts of drugs known as "biologics" to the
public. "Biologics," (the FDA distinguishes from small molecule "drugs") include (1) therapeutic DNA
plasmid products; (2) therapeutic synthetic peptide products of 40 or fewer amino acids; (3) monoclonal
antibody products for in vivo use; and (4) therapeutic recombinant DNA-derived products". Biologics are
licensed under the provisions of PHS Act but meet the definition of drugs under FDCA subject to Center
for Drugs Evaluation and Research (CDER) inspection jurisdiction.

FCA Recovery Complaint                          20

1    emphasized, required, and contingent upon AMGEN to include additional validation study data,

2    conduct additional studies, continue characterization of ARANESP in a commercial

3    environment, identify impurities, and promptly include validation specifications for ongoing

4    manufacturing of ARANESP filtered bulk proteins.  See Exhibit H – Approved BLA Notice –

5    ARANESP.

6

7    52.    This FDA approval was contingent upon AMGEN performing the required actions

8    consistent with 21 CFR 601.12 (*See STN Number: BL 103951/0 dated September 17, 2001 –* See

9    Exhibit H – Approved BLA Notice - ARANESP).  A specific requirement to close validation

10   protocols within 45 days of starting studies and/or releasing product for distribution was a lawful

11   commitment (See AMGEN's response to FDA 483 – Exhibit I – 45 Day validation protocol

12   commitment to FDA) made by AMGEN's quality management to the FDA, and notifying

13   CBER of the FDA before each lot release.  Training, awareness, and oversight were sporadic at

14   best as part of this commitment throughout AMGEN.

15

16                                IV. PARTIES

17

18   53.    Relator SAMUEL J. MAY is a UNITED STATES CITIZEN, and at all times relevant

19   was, of East Indian descent currently residing in Contra Costa County, California, and at times

20   relevant to the action also in the City of Longmont, County of Boulder, State of Colorado. Until

21   recently, he was an AMGEN employee, the original source of the facts and information

22   hereinafter set forth concerning the activities of AMGEN and its affiliated corporation. The facts

23   averred herein are based upon his personal experience, knowledge, observations, and

24   investigations, and upon documents and information in his possession.

25

26   54.    Relator MAY is a highly specialized Consulting professional with over 24 years in the

27   BioPharma, Chemical, and Information Technology industry sectors.  He is an independent

28   consultant offering turn key compliance & process improvement solutions, while solving

29   business problems for highly regulated and emerging companies. MAY has worked exclusively

FCA Recovery Complaint                          21

in this highly regulated product research, development, manufacturing, and marketing of healthcare products.

55.     His experience comes with successfully dealing with regulators, scientists, business executives, and other consumers who depend on working through the regulatory maze of receiving product approvals for commercialization. He has led large global teams and has hands-on experience dealing with more than 10-12 different Pharmaceutical, Biotechnology and Medical Device firms, engaged in post approval commitments, compliance, ISO quality certifications and manufacturing operations.

56.     Relator's educational backgrounds include a Bachelor's in Chemistry from BYU (Provo, Utah), and additional graduate pharmacology and medical course work at University of Utah and Ross University School of Medicine respectively. He has also completed additional coursework in Regulatory Science at USC (School of Pharmacy - Los Angeles, CA) and has obtained certifications in managing Software Development Methodologies.

57.     Relator recently earned an Executive Master of Business Administration (EMBA) from Golden Gate University (San Francisco). He is an excellent team player in his ability to interact with wide audience, including legal teams, product portfolio presentations, Government investigators, and in providing Technical solutions for cross-functional teams in small to large companies. He is diabetic, married, and is the sole provider raising minor children.

58.     US Food and Drug Administration (FDA) Plaintiff's real party of interest
The Federal Food, Drug and Cosmetic Act (or "FDCA"), Public Health Service Act (or "PHS Act") and the regulations promulgated there under govern, among other things, the raw materials and components used in the production of, research, development, testing, manufacture, quality control, labeling, storage, record keeping, approval, advertising and promotion, and distribution of ARANESP and EPOGEN. Failure to comply with the applicable regulatory requirements will subject AMGEN to a variety of administrative and/or judicially imposed sanctions.

FCA Recovery Complaint                    22

1  59.   These sanctions may include the FDA's refusal to approve pending applications,

2  withdrawals of approvals, suspension of license, warning letters, product recalls, product

3  seizures, and total or partial suspension of manufacturing operations, injunctions, fines, civil

4  penalties and/or criminal prosecution. AMGEN knowingly failed to correct deficiencies and

5  continued to violate the provisions of its commitments and licensing requirements.

6   59.1   **FDA Regulation of Manufacturing Standards.**

7   The FDA regulates and inspected AMGEN's equipment, facilities, laboratories

8   and processes used in the manufacturing and testing of ARANESP and EPOGEN

9   prior to providing approval to market. After receiving approvals, when AMGEN

10   makes a material change in manufacturing equipment, location or process,

11   additional FDA review may be required. AMGEN must adhere to CGMP

12   regulations and product-specific regulations enforced by the FDA through its

13   facilities inspection program.

14   59.2   The FDA also conducted regular, periodic visits to re-inspect AMGEN'S

15   equipment, facilities, laboratories and processes following initial approvals. As

16   a result of these inspections, the FDA determined that AMGEN'S equipment,

17   facilities, laboratories or processes did not comply with applicable FDA

18   regulations and conditions of product approval. FDA may seek civil, criminal

19   or administrative sanctions and/or remedies against AMGEN, including the

20   suspension of manufacturing operations.

21

22  60.   Center for Medicare and Medicaid Services (CMS)

23      Plaintiff's real party of interest

24  AMGEN participates in the Medicaid drug rebate program established in Section 1927 of the

25  Social Security Act by the Omnibus Budget Reconciliation Act of 1990 and subsequent

26  amendments of that law. Participation in this program requires AMGEN to provide discounts

27  under the Public Health Service ("PHS") drug pricing program. The terms of AMGEN'S

28  participation in the Medicaid drug rebate program impose an obligation to correct the prices

FCA Recovery Complaint                23

1   reported in previous quarters, as may be necessary. Any such corrections could result in an

2   overage or underage in AMGEN'S rebate liability during the past.

3

4   61.    Defendant AMGEN INC. (or "AMGEN"), incorporated in 1986 under the laws of

5   Delaware, is a publicly-traded biotechnology medicines company, with its principal place of

6   business in Thousand Oaks, Ventura County, California. AMGEN maintains business in several

7   places, including California, Colorado, Washington, Kentucky, Rhode Island and Puerto Rico.

8   AMGEN transacts business in this district through its agents and employees at physical

9   addresses[24]. AMGEN developed, manufactures, distributes, and markets ARANESP and

10  EPOGEN, Erythropoietic-Stimulating Agents (or "ESAs") that stimulate the production of red

11  blood cells. AMGEN implemented "Tour of California" since 2005, and is the largest cycling

12  event in the United States. ESA doping is prohibited by US cycling and other international

13  governing bodies.

14

15                         V. JURISDICTION & VENUE

16  62.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 28 U.S.C. §§

17  1345, 28 U.S.C. §§ 1367(a). This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et*

18  *seq.,* and 3730 under common law theories including fraud. In addition, 31 U.S.C. §§ 3732 (b)

19  specifically confers jurisdiction on this court over the state law claims asserted in this complaint.

20

21  63.    This Court may exercise personal jurisdiction over AMGEN pursuant 31 U.S.C. §

22  3732(a) (False Claims Act) and 28 U.S.C. § 1331 because AMGEN transacts business and

23  maintains offices in this district by hiring and firing of employees.

24

25  64.    Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because:

26         (i) AMGEN also resides in this district;

_____

24   AMGEN San Francisco Bay Area Sites:
AMGEN South San Francisco - 1120 Veterans Blvd, South San Francisco, CA 94080,
AMGEN Fremont - 6701 Kaiser Dr. Fremont, CA 94555

FCA Recovery Complaint                    24

1   (ii) AMGEN Manufactures, conducts Research, maintains employees, and transacts

2   significant sales in this district and did so at all times relevant to this complaint; and, as

3   averred below,

4   (iii) AMGEN committed acts proscribed by 28 U.S.C. § 3729—acts giving rise to this

5   action—within this district.

7   65.    In filing this complaint, Relator served a copy of same upon the UNITED STATES,

8   together with a written disclosure statement setting forth and enclosing all material evidence and

9   information he possesses, pursuant to the requirements of 31 U.S.C. § 3430(b)(2).

11   66.    Several potential witnesses who are former AMGEN employees and consultants reside in

12   this district. Relator's continued violation theory has occurred in this district with economic,

13   financial, and property losses not limited to special damages. Relator was also engaging in

14   validation business prospects with AMGEN in this district.

# VI. APPLICABLE STANDARD OF LAWS

18   A.    <u>False Claims Act 31 U.S.C. §§ 3729(a), (a) (2), (a) (4), and (a) (5)</u>

19   67.    Under CMS (Public Health & Welfare Law)

20   <u>Medicaid Drug Rebate Program (Including Medicare parts B and D)</u>[25] - Section 1927 of the

21   Social Security Act (the Act) established the Medicaid drug rebate program. For AMGEN's

22   covered outpatient drugs (ARANESP and EPOGEN) to be eligible for Federal funding under the

23   program, AMGEN must enter into a rebate agreement with the CMS and pay quarterly rebates to

---

[25]   Medicaid program was created in 1965 in Title XIX of the Social Security Act and covers approximately 47 million individuals, including children, the aged, blind, and/or disabled, and people who are eligible to receive federally assisted income maintenance payments. It is a joint federal-state program that provides healthcare benefits including prescription drug coverage, for certain groups, including the poor and the disabled. The most basic requirement for reimbursement eligibility under Medicare, Medicaid and other government healthcare programs is that the service provided must be medically necessary. *See, e.g.,* 42 U.S.C. § 1395y (a) (1) (A); 42 U.S.C. § 1396, et seq.; 42 C.F.R. § 410.50.

FCA Recovery Complaint                25

1   the States. Section 1927(b) (3) of the Act requires a participating manufacturer to report

2   quarterly to CMS the Average Manufacturer Price (or "AMP") for each covered outpatient drug.

3   Section 1927(k)(1) defines AMP as the average price paid to the manufacturer by wholesalers for

4   drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay

5   discounts. Therefore, reporting accurate quarterly AMP by AMGEN is critical for this

6   mechanism to work fairly without fraud, abuse, or waste.

7

8   68.    The Medicaid reimbursement program ensures that CMS has access to the same price

9   discounts and deals received by commercial customers at AMGEN. The program requires

10  AMGEN, on a quarterly basis, to pay rebates to state Medicaid offices that have subsidized the

11  purchase of AMGEN's drugs during that quarter. 42 U.S.C.S. § 1396r-8. The rebate due is

12  calculated by multiplying the difference between the AMP and the BEST PRICE (or "BP") for

13  the covered drug by the total number of units paid for by the State during that rebate period.

14        68.1   The AMP is defined as the average price paid to the manufacturer for the drug in

15        the United States by wholesalers for drugs distributed to the retail pharmacy class of

16        trade. 42 U.S.C.S. § 1396r-8(k) (1) (A). The BP is defined as the lowest price available

17        from AMGEN during the rebate period and must include cash discounts, free goods that

18        are contingent on any purchase requirement, volume discounts, and non-exempted

19        rebates. 42 U.S.C.S. § 1396r-8(c) (1) (C) (I)-(ii).

20

21  69.    This BP ensures that the government is provided the lowest price on drugs. CMS uses

22  AMP to calculate a unit rebate amount for each covered outpatient drug (ARANESP &

23  EPOGEN) and provides the unit rebate amounts to the States. The States determine the total

24  rebates that AMGEN owes by multiplying the unit rebate amount by the number of units of the

25  drug dispensed to Medicaid/Medicare beneficiaries. Section 1847A (d) (2) (B) of the Social

26  Security Act (the Act) mandates that Office of Inspector General (the "OIG") compare Average

27  Selling Price (or "ASP") to AMPs.

28        69.1   *Pursuant to sections 1847A(d)(3)(A) and (B) of the Act, if OIG finds that the ASP*

29        *for ARANESP and EPOGEN exceeds the AMP by a certain percentage (currently 3%),*

FCA Recovery Complaint                    26

1    *the Secretary of the Department of Health and Human Services (the "Secretary") may*

2    *disregard the ASP for the drug when setting reimbursement amounts.*

3

4    70.    Section 1847A(d)(3)(C) of the Act goes on to state that ". . . the Inspector General shall

5    inform the Secretary (at such times as the Secretary may specify to carry out this subparagraph)

6    and the Secretary shall, effective as of the next quarter, substitute for the amount of payment . . .

7    the lesser of (i) the widely available market price . . . (if any); or (ii) 103% of the average

8    manufacturer price . . . .". Since 2009, ARANESP and EPOGEN receive 104% of the ASP from

9    CMS. In the past, CMS has reimbursed up to 6% of ASP for ARANESP.

10

11    71.    AMGEN is required to report both the AMP and BP for each of its covered drugs to the

12    CMS. CMS then calculates the unit rebate amount and reports it to the state Medicaid agencies.

13    The states then use the unit rebate amount, and data from pharmacies about ARANESP and

14    EPOGEN utilization during a respective quarter to calculate the rebate owed to them by

15    AMGEN. Therefore, this fair process depends on accurate AMP and BP reporting with no CMS

16    oversight. However, it failed to report true manufacturing costs accurately inflating sales data.

17

18    72.    The FCA permits a private individual, called a qui tam "Relator," to file a civil action

19    against, and recover damages on behalf of the United States from, any person who:

20        (1) Knowingly presents, or causes to be presented, to an officer or employee of the

21        United States Government . . . a false or fraudulent claim for payment or approval;

22        (2) Knowingly makes, uses, or causes to be made or used, a false record or statement to

23        get a false or fraudulent claim paid or approved by the Government. 31 U.S.C. §§

24        3729(a)(1)-(2), 3730(b)(1), (c)(3); *United States ex rel. Clausen v.*

25        *Laboratory Corp. of America, Inc., 290 F.3d 1301, 1308 n.4 (11th Cir. 2002).*

26

27    73.    Section 3730(b) (1) of the FCA states that actions brought by private individuals "shall be

28    brought in the name of the Government." 31 U.S.C. § 3730(b)

FCA Recovery Complaint                    27

(1). Regarding the rights of the parties to qui tam actions, the FCA provides, first, that "[i]f the government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action[,]" 31 U.S.C. § 3730(c)(1), and second, "[i]f the government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action[,]" 31 U.S.C. § 3730(c)(3).

"The United States is the real party in interest in a qui tam action under the False Claims Act even if it is not controlling the litigation." *United States ex rel. Walker v. R&F Properties of Lack County, Inc., 433 F.3d 1349, 1359 (11th Cir. 2005)*". "The purpose of the Act . . . is to encourage private individuals who are aware of fraud being perpetrated against the government to bring such information forward." *Ragsdale v. Rubbermaid, Inc., 193 F.3d 1235, 1237 n.1 (11th Cir. 1999)*.

74.    Anti-retaliation protections under §3730(h)[26] are available whenever an FCA action is a "distinct possibility," the 11th Circuit ruled. Further, an FCA case need never be filed or even contemplated by a Relator or the Government for the provision to apply. Government urged the 11th Circuit to follow the 7th Circuit's ruling in *Neal v. Honeywell, Inc., 33 F.3d 860 (7th Cir. 1994)*, that §3730(h) applied to an employee who had provided false claims information to the Government even though no FCA case was ever filed.

75.    The FCA is silent on whether a private individual can bring a qui tam suit pro se. See 31 U.S.C. §§ 3729-3733. The plain language of the FCA does not limit qui tam actions to those private individuals employing counsel. See 31 U.S.C. § 3730(b) (1), (c) (3). The FCA simply states that "[a] person may bring a civil action" under the FCA "for the person and for the United States Government." 31 U.S.C. § 3730(b) (1).

---

[26] Section 3730(h) Retaliation Claims *Childree v. UAP/GA AG Chem, Inc. et al., 92 F.3d 1140 (11th Cir. Aug. 28, 1996)*.

FCA Recovery Complaint                    28

B.    Federal Food, Drug, and Cosmetic Act (FDCA) 21 CFR Parts 210, 211, 11

C.    21 CFR Part 600-680, where applicable

D.    Public Health Service Act (PHS Act) Section 351 42 USC

76.    Under FDA (Public Safety and Efficacy)

AMGEN must comply with all applicable Statutes of the Federal Food, Drug, and Cosmetic Act (FD&C), Public Health Service Act (PHS Act), 21 CFR Part 210 (General and Specific - CGMP in Manufacturing, Processing, Packing, or Holding of Drugs), 21 CFR Part 211 (CGMP for Finished Pharmaceuticals), 21 CFR Part 11 (FDA's Final Rule on Electronic Records and Electronic Signatures).  The Biologics License Application (BLA) under PHS Act is a request for permission to introduce, or deliver for introduction, a biologic product into interstate commerce (21 CFR 601.2). See Exhibit H - Approved BLA Notice – ARANESP.

77.    The BLA is regulated under 21 CFR 600 – 680 et seq., including Certification of Compliance, under 42 U.S.C., 282(j) (5) (B), and 42 U.S.C § 262. Regulation of biological products.  In addition to these mandatory statutes, AMGEN is required to comply with  post approval regulatory commitments (See Exhibit I - 45 Day Validation Protocol commitment to FDA). Binding agreements to comply with Inspectional observations, including voluntary and involuntary regulatory commitments in accordance with FDAAA (US Food and Drug Administration Amendments Act of 2007).

B.    Federal Food, Drug, and Cosmetic Act (FDCA) 21 CFR Parts 210, 211, 11

78.    Code of Federal Regulations – 21 C.F.R Parts 210 (CGMP):

21 C.F.R. 210.1 – § 210.3 Subparts – CURRENT GOOD MANUFACTURING PRACTICE IN MANUFACTURING, PROCESSING, PACKAGING, or HOLDING OF DRUGS; GENERAL

**Authority:** 21 U.S.C. 321, 351, 352, 355, 360b, 371, 374; 42 U.S.C. 216, 262, 263a, 264.

**Source** – 43 FR 45076, Sept, 29, 1978, Unless otherwise noted.

FCA Recovery Complaint                    29

79.     Code of Federal Regulations – 21 C.F.R. Parts 211 (CGMP):

21 C.F.R. Part §211.1 – 211.208 (All subparts) – CURRENT GOOD MANUFACTURING

PRACTICE FOR FINISHED PHARMACEUTICALS.

   **Authority:** 21 U.S.C. 321, 351, 352, 355, 360b, 371, 374; 42 U.S.C. 216, 262, 263a, 264.

   **Source:** 43 FR 45077, Sept. 29, 1978, unless otherwise noted.


80.     Code of Federal Regulations – 21 C.F.R Part 11:

21 C.F.R. Part §11 Subparts (A) (B) (C) – §11.1 to 11.300 – ELECTRONIC RECORDS:

ELECTRONIC SIGNATURES.

   **Authority:** 21 U.S.C. 321-393; 42 U.S.C. 262.

   **Source:** 62 FR 13464, Mar. 20, 1997, unless otherwise noted.


                    C.     21 CFR Part 600-680, where applicable

81.     For all intensive purposes of this complaint, *current good manufacturing practice* refers

to the current good manufacturing practice (CGMP) regulations for drugs and most biological

products under 21 CFR Parts 210 and 211, for certain biological products under 21 CFR Parts

600-680. ARANESP and EPOGEN were specifically licensed under section 351 of the Public

Health Service Act (21 CFR 601.2).


82.     Approval of BLA or issuance of a biologics license shall constitute a determination that

AMGEN's establishment and the products meet applicable requirements to ensure the continued

safety, purity, and potency of such products. Applicable requirements for the maintenance of

establishments for AMGEN is subject to this section and shall include but not be limited to the

good manufacturing practice requirements set forth in 21 CFR parts 210, 211, 600, 606, and 11.


              D.     §262 Regulation of Biological Products
              THE PUBLIC HEALTH AND WELFARE - Biologicals
                 (42 USC 262 - Laws in effect as of January 5, 1999)


FCA Recovery Complaint                          30

1   **Source**: Apr. 26, 1996, 110 Stat. 1321-319, 1321-320; Pub. L. 105-115, title I, Sec. 123(a)-(d),

2   (g), Nov. 21, 1997, 111 Stat. 2323, 2324.)

3

4   83.     Any violation shall subject the violator to a civil penalty of up to $100,000 per day of

5   violation. The amount of a civil penalty under this regulation shall, effective December 1 of each

6   year beginning 1 year after the effective date of this paragraph, be increased by the percent

7   change in the Consumer Price Index for the base quarter of such year over the Consumer Price

8   Index for the base quarter of the preceding year, adjusted to the nearest 1/10 of 1 percent.

9       *For purposes of this paragraph, the term "base quarter", as used with respect to a year,*

10      *means the calendar quarter ending on September 30 of such year and the price index for*

11      *a base quarter is the arithmetical mean of such index for the 3 months comprising such*

12      *quarter.*

13

14  84.     Interference with PHS Officers

15  No person shall interfere with any officer, agent, or employee of the Public Health Service in the

16  performance of any duty imposed upon him by this section or by regulations made by authority

17  thereof.

18      *Penalties for offenses - Any person who shall violate, or aid or abet in violating, any of*

19      *the provisions of this  section shall be punished upon conviction by a fine not exceeding*

20      *$500 or by Imprisonment not exceeding one year, or by both such fine and imprisonment,*

21      *in the discretion of the court.*

22

23  F.      Cal. Gov't Code Sections §12650-12656 – Article 9, FALSE CLAIMS

24                                  ACTIONS.

25  85.     Cal. Gov't Code Sections §12650-12656 – Article 9, FALSE CLAIMS ACTIONS[27] -

26  California common law under Fraud, where applicable. The California FCA protects

---

[27]   Under California common law, the elements of fraud are (1) misrepresentation; (2) knowledge of the
falsity of the representation; (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5)
resulting damages. The scienter for common law fraud is somewhat greater than that required by the False
Claims Act's, 31 U.S.C.S. § 3729 et seq., scienter requirement.

FCA Recovery Complaint                          31

1  whistleblowers from retaliation from their employer under a section entitled: "Section 12653

2  subdivision (c)". The California FCA, sometimes called the "whistleblower" statutes,

3

4  **G.   CALIFORNIA Labor Code §1102.5 to 1105**

5

6  86.   CALIFORNIA Labor Code §1102.5 to 1105 - Employer interference with

7  employee disclosures.

8  **§1102.5 (a)** An employer may not make, adopt, or enforce any rule, regulation, or policy

9  preventing an employee from disclosing information to a government or law enforcement

10  agency, where the employee has reasonable cause to believe that the information discloses a

11  violation of state or federal statute, or a violation or noncompliance with a state or federal rule or

12  regulation.

13  **§1102.5 (b)** An employer may not retaliate against an employee for disclosing information to a

14  government or law enforcement agency, where the employee has reasonable cause to believe that

15  the information discloses a violation of state or federal statute, or a violation or noncompliance

16  with a state or federal rule or regulation.

17  **§1102.5 (c)** An employer may not retaliate against an employee for refusing to participate in an

18  activity that would result in a violation of state or federal statute, or a violation or noncompliance

19  with a state or federal rule or regulation.

20  **§1102.5 (d)** An employer may not retaliate against an employee for having exercised his  or her

21  rights under subdivision (a), (b), or (c) in any former employment.

22   **§1102.5 (e)** A report made by an employee of a government agency to his or her employer is a

23  disclosure of information to a government or law enforcement agency pursuant to subdivisions

24  (a) and (b).

25  **§1102.5 (f)** In addition to other penalties, an employer that is a corporation or limited liability

26  company is liable for a civil penalty not exceeding ten thousand dollars ($10,000) for each

27  violation of this section.

28

FCA Recovery Complaint                    32

H.   COLORADO Whistleblower Laws – Colo. Rev. Stat §24-114- 102, et. seq.

87.   Colo. Rev. Stat § 24-114-102 prohibits retaliation against an employee for reporting an employer's illegal conduct. Colorado also extends the same protection to employees of private enterprise under contract with the State.

# VII. FACTUAL ALLEGATIONS

88.   Relator was hired by AMGEN on April 8, 2002 as a Computer Validation Specialist (Grade 25) responsible for validating computer systems and protocols utilized by AMGEN at its facility in Longmont, Colorado. He was the sole Computer Validation Engineer representing the Colorado site for AMGENS' globally shared information systems. His responsibilities as the Colorado site representative for shared computer systems included ~25% of his work guiding quality compliance for Colorado servers and databases since 2002.   His other responsibilities included many Global/Shared computer systems (ERP, AMPS, QMTS, LIMS, CCIS, Supplier database, SMS) amounting to ~75%. He was well received by his global counterparts and collaborated successfully at AMGEN Colorado and California sites.

89.   Within 5 weeks after being hired Relator was reclassified as Computer Validation Engineer III (Grade 26) based on his superior performance. During the next two years he received glowing reviews, recognition awards, stock awards, and commensurate bonus and salary increases while positioned for career advancement atop 10th percentile of all employees.

90.   As a condition of FDA approval for the indication of ARANESP for anemia due to early stage renal disease and for anemia due to chemotherapy, AMGEN was required to comply with several laws and regulations including but not limited to FCA Laws, FDCA, PHS Act and 21 CFR 600 – 680 applicable parts and related subparts. This required, inter alia, that it continually validate and test its compliance with its own manufacturing protocols, and that it do so

FCA Recovery Complaint                    33

1  within 45 days of pre-approving each manufacturing campaign or validation studies[28].

2

3  91.    Also, as it was alternately manufacturing both ARANESP and EPOGEN in the same

4  equipment, it was essential to document and post-approve the thorough and complete cleaning of

5  the equipment and process between cycles of Cell Culture, Fermentation, Harvesting, and

6  Purification.  However instead of complying with these regulations AMGEN took short cuts,

7  such as not completing protocols or studies, shuffling staff, constraining resources, and not

8  storing or recording data, that jeopardized the safety and welfare of consumers who received the

9  ARANESP and EPOGEN formulations.

10

11  92.    Relator was assigned to assist the 21 CFR Part 11 implementation program at AMGEN.

12  This computer related compliance implementation framework established by AMGEN

13  management and included several computer systems used to support ARANESP and EPOGEN

14  manufacturing. Systems were identified, evaluated for risk, and inventoried subject to 21 CFR

15  Part 11 upgrade and validation requirements.  The FM Pro database with multiple instances of

16  Validation tracking, V-Status, and Tasks management system was excluded within the scope of

17  21 CFR Part 11 program which then became subject to non-compliance directly impacting the

18  tracking of the open protocols or studies at AMGEN Colorado ("ACO").

19

---

[28]  A type of AMGEN document issued to perform Validation testing for currently pre-approved and post-approved Validation acceptance criteria or specifications.  Validation studies are performed to demonstrate that a system or a process does what is intended to do in a reliable fashion and in a state of control, which results in a product consistently meeting pre-determined specifications.  FDA also defines validation as "Documented evidence of testing approved to predetermined specifications and acceptance criteria".  Performance Qualification, Process Validation, Characterization studies and Periodic Monitoring studies are validation studies performed per a written, pre-approved protocol that specifies how validation of a particular process or system will be conducted, justifies the methodology and strategy adopted for testing and evaluation. The validation protocol specifies the critical process steps, operating ranges and acceptance criteria for the system or process performance. The validation report summarizes and analyzes the data collected during the study per the pre-approved validation protocol, commenting on any deviations observed and stating the conclusion of the study. All Performance Qualification and Process Validation reports must become effective (i.e., approved by all designated department representatives) within **45** business days from the study completion date.

FCA Recovery Complaint                    34

93.     In Summer of 2004, routine FDA inspection revealed a number of manufacturing deficiencies and validation irregularities at the LakeCenter – Boulder facility, such as validation protocols being open too long, lack of validation for how the data was stored in computer systems, cleaning hold times, fraud in calculations, and more.  AMGEN shares resources, materials, and manufacturing and quality personnel between Boulder and Longmont facilities.  Each facility is designed for and designated as microbial and mammalian [29]respectively.

94.     FDA Fraud investigators returned to review AMGEN's attempts to obfuscate its own applicable standards including laws of the FDA and United States during the course of several months. Relator, brought notice to his supervisor Steve Wiseman of FDA's fraud investigation who had been reviewing calculation errors and QA oversight regarding  AMGEN's Manufacturing Process Systems ("AMPS"). AMGEN was made aware then by Relator and his supervisor that government's fraud investigation would lead to a distinct FCA action.  Relator again brought similar complaints to his supervisors, including corporate compliance officer when the back log of open validation studies was uncovered. See Exhibit B - AMGEN 2004 response to 483, AMGEN will improve all processes (Letter from Tillet) Dated April 11, 2005

95.     A subsequent FDA inspection in July 2004 at the Longmont ARANESP and EPOGEN facility revealed that these irregularities were continuing and that the FDA again suspected fraud and abuse in the documentation of the manufacturing processes.  FDA inspectors requested a list of all computer systems used in support of manufacturing, a list was put together which did not include the FM Pro database used for tracking open protocols or studies and V-Status data.

96.     At this time, Relator again voiced his suspicions of fraud, abuse, and non-conformance to his superior Steve Wiseman and regulatory peer Karen Pyatt who was assisting the inspections.

---

[29]   Manufacturing of biologics or biomanufacturing is a multi-step process with a current 60:40 split between mammalian cell culture and microbial fermentation. Today about 60% of all recombinant protein pharmaceuticals are produced in mammalian cells requiring specialized training, experience, and skills. ARANESP and EPOGEN are manufactured in mammalian facilities at AMGEN.

FCA Recovery Complaint                          35

1    To address these concerns among others, AMGEN again specifically agreed with the FDA that it
2    would close all validation protocols or studies within 45 days or to provide justifications with
3    interim summary reports.

4

5    97.    Customary to meetings held very 6 months titled "All site Staff Meetings", employees
6    were urged to attend such 2 hour long meetings with food and liquor where Sales and Marketing
7    executives were knowingly promoted off-label[30] uses of ARANESP and EPOGEN doses that
8    were neither effective not safe, all for the purpose of significantly increasing their sales.

9    *A phrase consistently termed and promoted "Every Patient, Every Time, All the Time",*
10   *encouraged employees including Relator to take shortcuts and become nimble in*
11   *manufacturing ARANESP and EPOGEN while ignoring the lawful regulations and FDA*
12   *requirements.*

13

14   98.    Relator became aware of GAMBRO HEALTH CARE, a Dialysis Center located at
15   10810 W. Collins Ave, Lakewood, Colorado visited on or about March 2006 who were
16   investigating abnormal drop in hemoglobin levels. AMGEN Territory manager assigned to that
17   facility was collecting patient lab data as a result of current Anemia study conducted by
18   AMGEN.

19   98.1    The territory manager provided details of improving "Quality of Life", improving
20   Diabetes blood glucose control, having greater energy among other off-label claims for
21   ARANESP and suggested to review a study[31] titled "Health-Related Quality of
22   Life Predictors of Survival and Hospital Utilization" of 103 ESRD patients on
23   hemodialysis. Such off-label promotional statements by AMGEN employees coerced

---

[30]   ARANESP's narrow FDA-approved indication limits the potential sales growth of the drug,
particularly in view of the fact that other ESA's are also available to the public. AMGEN knowingly
promoted higher doses of ARANESP to maintain hemoglobin (Hgb) levels at dangerously high levels
greater than approved at $10 - 12$ g/dL.

[31]   George R. Parkerson, Jr., and Robert A. Gutman with Duke University Medical Center. This research
was funded by Amgen Inc. under Grant Number EPO-96-017. HEALTH CARE FINANCING
REVIEW/Spring 2000/Volume 21, Number 3

Relator and his widowed mother to seek ARANESP treatments though not medically required yet.

99.    Relator was encouraged to seek ARANESP treatment for his aging mother in hopes of improving her quality of life and maintaining hemoglobin at dangerous levels based on miraculous events heard in the workplace. Relator and his family sacrificed great deal of money to finance his mother's ARANESP treatments.  His mother suffered untimely death due to cardiovascular events infused with high doses of ARANESP.

100.    Thereafter, Relator's job performance reviews were suddenly called into question and AMGEN managers began to claim that Relator was not a team player and was not capable of performing his employment properly.  Nonetheless, he continued to propose strategies with cost analysis and required resources so that AMGEN would become compliant to FDA regulations by closing or justifying the backlog of open protocols.

101.    In an effort to allow AMGEN to promptly correct unlawful and retaliatory behavior and to avoid FCA litigation, Relator objected to such practices and filed several complaints with AMGEN, and each of them, including without limitation, with Relator's supervisors, frontline managers, and complaints with the Human Resources Department, Ombudsman officer, and Corporate Compliance Officer.  These complaints were welcomed at first but ignored later.

102.    In April 2005, Relator voiced concerns and interviewed with the new head Corporate Compliance Officer, Tom Zindrick, based in Thousand Oaks, California.  He was verbally promised a position within a new compliance unit that was to operate across all sites, reporting to Zindrick (See Exhibit J – Email response from Zindrick).  Relator advised Zindrick of the non-compliance problems at Longmont, especially validation failures and manufacturing violations, and the celebration of "483 burn parties" after the FDA inspections were held at which among others, the head of the plant operations, QA, and Regulatory were seen drinking and burning

FCA Recovery Complaint                           37

1   copies of the 483[32] issued by FDA. Zindrick never investigated these complaints. That position

2   was later withdrawn.

3

4   103.   Relator was then assisting in tracking the closure of open validation protocols dating back

5   to 1999, which he was told were 64 in number but were not justified for being open for so long.

6   Between April and August 2005 he was able to retrospectively track closure of the 24 of 64

7   validation studies while developing a new proactive methodology to become compliant while

8   investigating the lateness of such open studies.

9

10   104.   However, at the same time, Relator also discovered that there were some 214 additional

11   open protocols, including ARANESP and EPOGEN studies, hidden in a discrete database that

12   should have been closed or justified prior to the issuance for distribution and use of the

13   ARANESP and EPOGEN related to those protocols, but was not then closed in violation of FDA

14   regulations.

15   *This validation tracking database was willfully and knowingly excluded within the*

16   *scope of AMGEN's 21 CFR Part 11 program but continually provided status updates and*

17   *management reports concerning open validation protocols and 45 day commitment*

18   *reports (*See Exhibit C - FM Pro Database Validation Meeting, Email correspondence

19   from Nancy Johnson).

20

21   105.   The proper completion of these protocols or studies was the only way to tell if the drugs

22   were purified and safe.  When these validation studies were not completed and it became

23   necessary for ARANESP and EPOGEN to be distributed for final packaging,

24

---

[32]   This is the form used by FDA investigators to record their observations of non-compliance with
CGMP's. While firms are not required to respond to 483's, it is considered prudent to do so, telling the
FDA what will be done to correct not just the immediate, specific problem, but also the system(s) that are
the root(s) of the problem.

FCA Recovery Complaint                    38

1    Validation managers in Colorado are required to flag each suspected lot to a V-Status[33] protocol

2    holding pattern in completing summary reports for lot release approval. In the absence of such

3    management control the V-status tagging program was halted or ignored in an effort to release

4    manufacturing lots for distribution driven by sales and marketing demands.

5

6    106.   These anomalies were reported by Relator to his immediate supervisors Steve Wiseman,

7    and Mark O'Neill, peers Claudia Morris, document manager Nancy Johnson, Lowell Jackson, Ed

8    Arling, and Diane Espinoza and their managers. AMGEN had discontinued this V-Status

9    tagging practice unlawfully and tried to jump start it again around 2006. Relator discovered that

10   these required protocols were not being properly closed despite AMGEN'S representations -

11   contrary to the FDA, again in violation of federal regulations.

12

13   107.   Relator was removed from tracking these open protocols, told not to worry about them,

14   they were out of scope, that they would be taken care of, and Relator was then also excluded by

15   his supervisors from important meetings and was required by his supervisors to send reports that

16   defended the practices of his supervisors and sign off monthly management reports.

17       *"The knowledge element of the False Claims Act, 31 U.S.C.S. § 3729 et seq., requires that the*

18       *defendant (AMGEN) - (1) has actual knowledge of the information, (2) acts in deliberate*

19       *ignorance of the truth or falsity of the information or (3) acts in reckless disregard of the truth or*

20       *falsity of the information. 31 U.S.C.S. § 3729(b).*

21

---

[33]   The purpose of the V-status is to determine if any validation tests and sampling failed acceptance
criteria and if that failure could potentially have an impact to the releaseability of a lot. If for example,
buffer hold sample failed a key performance parameter (e.g. bioburden) that compromised buffer could
have been used during production and a thorough investigation would need to be initiated to determine if
there is any impact to the product lot. In this situation the lot is tagged as V- status until all testing study
is complete or justified. In many cases ARANESP or EPOGEN lots get released to distribution assuming
risk and hoping they don't have to recall the lots while AMGEN investigates. The open protocols are one
way of determining this very risky practice. The V-Status program at AMGEN assures that concurrent
process and cleaning validation associated with a product lot is reviewed prior to intermediate commercial
drug product disposition and completed (i.e. report approved) prior to final drug product lot disposition.
Information used to compile the list of validation studies that impact the V-Status state of a given product
lot is maintained in the **Validation Tracking database**.

FCA Recovery Complaint              39

108.   In September through December 2005, Steve Wiseman and his managers had informed upper management and the FDA that all open protocols had been properly closed out.  This report was false, and was known by Wiseman and his superiors to be false.  Relator objected to front line managers Steve Wiseman, Mark O'Neill, and Tiffinie Butters that this report was false, and at that point Relator was taken off the project and verbally warned not to "Rock the Boat".

109.   Many of the studies including the DAHANCA study[34] that AMGEN purposely failed to disclose to the FDA on or about October 2006, that revealed tumor progression were conducted with lots of ARANESP that were manufactured under the non compliance conditions which Relator was objecting to. On or about September 20, 2006 – AMGEN'S Chief Information Officer ("CIO") Hassen Dayem who had approved identifying all information systems for upgrades and validation was replaced. See Exhibit K – CIO Replaced.

110.   FDA alert was issued on November 16, 2006 due to study, Correction of Hemoglobin and Outcomes in Renal Insufficiency ("CHOIR"), published in the New England Journal of Medicine finding that patients treated with ESA and dosed to a target of hemoglobin ("Hb") concentration of 13.5 g/dL, had significantly higher chance for serious and life threatening cardiovascular complications compared to those treated with an ESA to a target Hb concentration of 11.3 g/dL.  See Exhibit L – FDA Alerts issued on 11/16/2006 and 12/16/2007.

111.   In October 2006 -  Negative safety data and patient death information were published by Dutch scientists-serious adverse data from ARANESP trials among head and neck cancer. The clinical trial was to be halted due to serious adverse effects as posted on their website (www.dahanca.dk). Bulk drug for these studies were manufactured in Colorado and Thousand Oaks facilities, the final formulation, Fill/Finish and distribution were carried out in Puerto Rico and Louisville, KY respectively.

---

[34] Clinical Study of the importance of Novel Erythropoiesis Stimulating Protein (ARANESP) for the effect of radiotherapy in patients with primary squamous cell carcinoma of the head and neck tested human subjects with high doses of ARANESP, greater than was approved.
.

112.   The DAHANCA trial was officially stopped on or about Nov. 28, 2006, due to futility following an interim analysis. AMGEN admitted it made an error in judgment by not publicly releasing the preliminary results that had been communicated to them by the DAHANCA Principal Investigators. According to a summary posted on the Danish group's Web site, the study was first stopped on Oct. 18, 2006 "due to information about potential unexpected negative effects related to the chemical analysis of the EPO receptor", a substance targeted by ARANESP to help stimulate red-blood-cell production.

113.   On February 16, 2007, The Cancer Letter, under the banner "Amgen Didn't Tell Wall Street about Results of Danish Study," reported that the DAHANCA trial had been halted in October 2006 because it showed "significantly inferior therapeutic outcome from adding Aranesp to radiation treatment of patients with head and neck cancer." (See Exhibit M – DAHANCA Cancer letter, Vol. 33 No. 6).

114.   As required, AMGEN did not report the safety issues known from this trial to the FDA. AMGEN'S Chief Financial Officer ("CFO") Richard Nanula was suddenly replaced about April 2007 pending an SEC inquiry (See Exhibit N – CFO Replaced). The direct and indirect costs for manufacturing ARANESP and EPOGEN are the ultimate responsibility of the CFO who oversees the day to day cash transactions, calculations relating to ASP/AMP/BP, and accounting for debit and credit journal entries for AMGEN.

115.   The true manufacturing overhead[35] incurred by AMGEN in producing ARANESP and EPOGEN is materially false because AMGEN purported in providing Manufacturing Personnel,

---

[35]   Manufacturing overhead (also referred to as factory overhead, factory burden and manufacturing support costs) refers to indirect factory-related costs that are incurred when AREANESP and EPOGEN are manufactured. Along with costs such as direct material and direct labor, the cost of manufacturing overhead must be assigned to each unit of ARANESP and EPOGEN produced so that Inventory and Cost of Goods Sold are valued and reported according to Generally Accepted Accounting Principles (GAAP). How these costs are assigned to ARANESP and EPOGEN has an impact on the measurement of each individual product's profitability. This in turn accurately impacts ASP/AMP/BP calculations as required and reported to CMS.

Quality Assurance, Quality Control, and Validation resources to assure the safe and compliant manufacturing by properly managing and closing the validation protocols and validating related support systems but then it did not and committed to the FDA to improve these issues.

116.   AMGEN's operating income increased dramatically beginning 2001 because it did not expend the said manufacturing costs in assuring product quality and safety of ARANESP and EPOGEN bulk manufacturing. This fraudulent scheme to set and maintain inflated drug prices has resulted in substantial amount of Government payouts. See Exhibit O – AMGEN's Operating income profit 1999 - 2009.

117.   When quarterly ASP/BP/AMP calculations are reported and submitted to CMS fraudulently, it is actionable for FCA recovery. AMGEN willfully adulterated or tainted by not properly monitoring the manufacturing process, yield calculations, conducting cleaning and completing cleaning studies according to established periodic monitoring and other aspects of aseptic manufacturing of ARANESP and EPOGEN.  Significantly shorting [sic] lawful manufacturing costs required for producing each unit of ARANESP and EPOGEN Filtered Purified Bulk drugs and causing CMS to overpay for such tainted products.

118.   It was critical for AMGEN to report reasonable costs[36] it incurs in manufacturing, including bundling[37] price points for ARANESP and EPOGEN formulations, and for accurately providing CMS reimbursements to dependent states and entities. Office of Inspector General (OIG) report issued in May 2006, titled as

---

[36]   The Supreme Court held that "the [FCA] was intended to reach all types of fraud, without qualification, that might result in financial loss to the government." United States v. Neifert-White Co., 390 U.S. 229, 232 (1968).

[37]   Bundled sales refer to the packaging of drugs of different types with the condition that more than one drug type be purchased, or where the resulting discount or rebate is greater than would have been received had the drug products been purchased separately. Bundled sales will affect the AMP and BEST PRICE calculations. AMGEN ties Neulasta rebates to ARANESP purchases; Neulasta is also manufactured by AMGEN.

FCA Recovery Complaint                    42

"DETERMINING AVERAGE MANUFACTURER PRICES FOR PRESCRIPTION DRUGS UNDER THE DEFICIT REDUCTION ACT OF 2005",

This report concerning the manufacturers AMP calculations was summarized as follows:

> "*Existing requirements for determining certain aspects of AMPs are not clear and comprehensive, and manufacturers' methods of calculating AMPs are inconsistent. OIG's previous and ongoing work, which has primarily focused on how manufacturers calculate AMP, has found that the manufacturers reviewed interpret AMPs requirements differently*".

119. CMS implemented a national monitoring policy in 2006 to promote the efficient use of ARANESP in the Medicare ESRD in-facility dialysis population. FDA labeling for EPO recommended that as the hematocrit ("Cell Volume occupied by red blood cells"), approaches a reading of 36 percent, the dose of the drug should be reduced by 25 percent. This in turn reduced (▼11.30%) ESA coverage payment allowance limit prompted by CMS as follows:

**JULY 2006 Payment Allowance Limits for ARANESP and EPOGEN**

**ARANESP payment limit was reduced from July 2005 = (11.30%▼)**

| HCPCS Code | Short Description | HCPCS Code Dosage | Payment Limit |
|---|---|---|---|
| J0881 | Darbepoetin alfa, non-esrd (J0881) | 1 MCG | $2.975 |
| J0882 | Darbepoetin alfa, esrd use (J0882) | 1 MCG | $2.975 |
| J0885 | Epoetin alfa, non-esrd (J0885) | 1000 UNITS | $9.362 |
| J0886 | Epoetin alfa, esrd (J0886) | 1000 UNITS | $9.202 |

120. On July 17, 2007, the CMS published its highly anticipated final rule regarding both calculation of AMP and the BP reporting requirements that significantly impacted Biopharma manufacturers, pharmacies, and other entities. The final rule took effect on October 1 2007.

121.   Several staff that left or transferred elsewhere and were not able to complete validation assignments, other newcomers and untrained transient contractors assisted in conducting validation studies by taking shortcuts[38] in manufacturing to overproduce with poor capital allocation, and weak oversight of operating risk by not providing the required resources as negotiated with CMS and committed to the FDA, resulting [sic] in CMS fraud, abuse or waste. Additionally, AMGEN ignored patient safety at all costs to increase its profits and revenues unlawfully.

121.1   Fact example:

Between 2003 and 2005, on several occasions the head of Validation, Quality or other respective department leads were switched around between Boulder and Longmont facilities where some of the new department members released incomplete manufacturing lots of ARANESP and EPOGEN for distribution using an automated computer system called Amgen Manufacturing Operations System (AMOS).  Relator then assisted in revoking their system level access.

---

[38]   Preponderance of evidence and witnesses are available where Manufacturing short cuts constituted the following activities to release non-conforming ARANESP & EPOGEN:
- Hiding the FM Pro validation tracking database from internal validation staff members and FDA inspectors but unilaterally using it to provide management reports without validation control.
- Not replacing validation managers/QA decision makers promptly when Staff & contracted workers vacated (over 2 years to back fill)
- Shuffling key resources (validation/QA/plant operators) constantly between sites (Longmont & Boulder-Lakecenter) causing disruptions and confusion in the validation decision making process (microbial vs mammalian expertise).
- Excluding staff members in key meetings affecting real time decisions driven by market demands (Resin & UF/DF reuse validation, CCRB changes to EPO & NESP, Clean Hold Study, and Process Monitoring Plan). Increasing lot yields of ARANESP and EPOGEN without approvals.
- Un-managed, un-supervised V-Status database to monitor manufacturing lots placed on holds, no proactive programs in place until 2008.
- Not back filling validation study authors and contractors responsible to complete studies in progress (cleaning & process validation) resulting in enormous back logs.
- Sudden termination of responsible document managers (Jacque) and metrics reporters, changes in reporting requirements. Falsified information provided to FDA as part of Annual product reviews.
- Backlog of studies not closed within 45 days as committed to FDA while deleting some of those records when Corporate Compliance Officer was notified in December 2005.

FCA Recovery Complaint                    44

122.   Standard Operating Procedure (SOP - P600453) applies to validation activities performed concurrently with production of an ARANESP or EPOGEN lot; their status[39] must be assessed for the disposition of a respective manufacturing lot. The scope of this SOP was limited to defining the steps required to generate validation summaries required for product lot disposition. The validation summaries [sic] limited to process validation and cleaning performance qualifications that are associated with each lot disposition required oversight, and this list of summaries were to be generated using the Validation Tracking Database[40].

> 122.1 Due to FDA observation issued in June 2004, AMGEN revised SOP P601184, Process Validation at Amgen Colorado Manufacturing Facilities, (effective: July 2, 2004) to require that actual and expected percent yields be included in Process Monitoring Plans for processes requiring validation, and provide definition of actual and expected yields as described in this response.
>
> 122.2 Another revision to SOP P601184 also required that Process Monitoring Plans specify the appropriate phases of processing at which actual percent yield calculations are to be performed accounting for potential product loss including those due to operational errors or cycle losses due to equipment malfunctions for all products.

123.   Details of how to access and use the Validation Tracking Database and descriptions of the various layouts are addressed in the Validation Tracking Database Engineer User Guide. This compliance procedure was often knowingly ignored between 2001 through 2007 until when

---

[39]   Underreporting non-compliance issues to upper management by substitute leads in validation and quality assurance (ex: only 64 open protocols). Inaccurate, falsified information provided to FDA as part of Annual product reviews.
- Dysfunctional teams between manufacturing operators and process development engineers. No   safety oversight or customer complaints management process in place.
- Using dual database instance (AMOS) computer programs to release products without proper QA authorizations.
- There was no documentation indicating that adverse events in 2002-2003 were reviewed or correlated with manufacturing issues. One batch was traced to 41 adverse reaction reports according to FDA inspectional observations.

[40]   FM Pro Database was used by Colorado Validation staff to track validation studies & 45 day commitments

FCA Recovery Complaint                          45

1  Relator vehemently opposed to the unlawful activities seeking internal legal remedies on or
2  about 2005, at which AMGEN tried to renew its legal commitments.

3      123.1 In correcting an FDA observation in June 2004, AMGEN initiated Corrective
4  Action/Preventive Action ("CAPA") TR# 31427 and stated *"Amgen will revise SOP*
5  *P600405, Document Management Services Controlled Document Processing at ACO, to*
6  *clarify that the document owner and Quality Assurance are responsible for ensuring that*
7  *all changes are documented and appropriately justified and for ensuring that all changes*
8  *have been assessed for impact to validation. This is the sole governing procedure for*
9  *document change control at Amgen Colorado. This SOP will become effective on July 23,*
10 *2004. All affected staff will be trained on the revision to P600405 by August 6, 2004"*.
11 Even after this change requirement, AMGEN continued to ignore required compliance.

12

13 124.   Upon information, belief, and knowledge with limited investigation, Relator identifies a
14 small sampling of manufacturing lots of ARANESP and EPOGEN to be non-conforming, tainted
15 and or adulterated in terms of FDCA, PHS Act, and Part 11 regulations.

16     1. Cell culture - Four lots of Enriched media EPOGEN, manufactured and completed
17     during the months of August -September 2003 in Longmont. Two lots of non-enriched
18     media EPOGEN started during the same period.

19     2. Four lots of purified Bulk EPOGEN completed and released during this period, data
20     includes total yield for each lot of EPOGEN released which was greater than ordinarily
21     manufactured under compliant conditions.

22     3. Fraudulent EPOGEN and ARANESP lot distribution release details from JD Edwards
23     (AMOS – Amgen Manufacturing Operations System) database – electronic Lot trace &
24     lot disposition reports of the following:

25       •  Bulk Lot # 033C019378
26       •  Bulk Lot #'s 033C019379, 033C021254
27       •  Bulk Lot #'s 033C021250, 033C021253, 033C021252
28       •  Bulk Lot #'s 005C030984, 005C021626, 005C019376
29       •  Bulk Lot #'s 033C030418, 033C020244, 033C021255

FCA Recovery Complaint          46

- Bulk Lot #'s 005C015505, 005C015506, 005C015507
- Bulk Lot # 005C019376, Related NC, TR# 38440 – Final report
- NESP FPB – Lot 033C021252 released on 8/11/2004
- Transportation validation for NESP lot # 033C021252 released to Amgen Manufacturing Limited (AML).
- NESP Lot # 033A022372 and associated NC, TR# 36826 – Final report
- EPO purification Lot # 05C015495 –Change over and laboratory records
- Bulk Lot # 05C015502 (Process validation and Characterization summaries)

124.1  Additionally, several other lots of bulk ARANESP and EPOGEN between the periods of 1999 through 2008 for EPOGEN and 2001 through 2008 for ARANESP remains to be investigated for conformance to determine, safety, purity, and potency.

124.2  During an FDA observation issued in July 2004 for ARANESP and EPOGEN manufacturing, Millipore sterile filtration validation for EPOGEN and insufficiency of AMGEN's oversight of execution of the study for mold and bacillus[41] failures did not result in repeating study 3x (three times), per protocol. Specifically, mold not speciated to confirm to be same species as found in facility at time of validation.

124.3  AMGEN continued to ignore correcting such compliance observations and requirements, and failed to assure the safe manufacturing standards it purported to follow in supplying conforming ARANESP and EPOGEN bulk drug substance.

125.   The Medicaid drug rebate process relying upon a three-way interaction between manufacturers, CMS and the State Medicaid agencies is a public assistance program providing for payment of medical expenses for the poor and disabled. AMGEN manipulated the ASP/AMP/BP calculations based on number of ARANESP and EPOGEN units manufactured and sold but actual costs of manufacturing were inflated which then did not represent the true costs.

---

[41]   Bacillus is any rod-shaped bacterium or, more particularly, a rod-shaped bacterium of the genus Bacillus. Some bacterium in the genus cause disease, for example B. anthracis is the cause of anthrax

126.   Manufacturing budgets developed by facility managers requesting resources by way of headcounts to maintain compliance were denied or postponed.  Nonetheless, AMGEN reported as costs incurred for manufacturing ARANESP and EPOGEN such that the weighted AMP and unit BP costs calculations were deceptive.  Instead, the profits received from such unlawful actions were used by executive members to enrich their personal compensation plans.

127. Under §§ 601.12(d) and 314.70(g)(3), changes to the ARANESP and EPOGEN, production process, quality controls, equipment, or facilities that have minimal potential to have an adverse effect on a product's identity, strength, quality, purity, or potency as they may relate to its safety or effectiveness are required to be documented in an "ANNUAL REPORT" submitted to FDA each year within 60 days of the anniversary date of approval of the application for a biological product and in the next annual report required under §-314.81(b)(2)(iv)(b) for drug products approved under the FDCA.

128.   For changes under this category[42], AMGEN is required to submit in the "ANNUAL REPORT" a list of all products involved; and a full description of the manufacturing and controls changes including: the manufacturing site(s) or area(s) involved, the date each change was made, a cross-reference to relevant validation protocol(s) and/or SOPs, and relevant data from studies and tests performed to evaluate the effect of the change on the identity, strength, quality, purity, or potency of the product as they relate to the safety or effectiveness of the product.  AMGEN knowingly failed to disclose the required details in their Annual Product Evaluation reports because the hidden database containing backlog studies were not included.

   128.1  <u>Fact example 1</u>: A Study identified as AC20-C281-020 (AMGEN QA Pre-approved on 5/21/2001) authored by Vicki Reynolds, titled "<u>Irradiated Fetal Calf Serum: Performance of Column 1 to measure EPO DFM Product Purity and Quality</u>". Was never

---

[42]   Guidance for Industry - Changes to an Approved Application for Specified Biotechnology and Specified Synthetic Biological Products. U.S. Department of Public Health, US FDA - Center for Biologics Evaluation and Research (CBER), and Center for Drug Evaluation and Research (CDER) – published July 1997.

1   completed nor justified for being open in 2006.  The study results of such studies were to
2   be included and notified to the FDA in Annual Product evaluation.

3

4       128.2  <u>Fact example 2</u>:  A Study identified as AC20-C281-042 (AMGEN QA Pre-
5   approved on 4/10/2002) authored by Marcus Luscher, titled "<u>NESP Column 4 Pool NFP</u>
6   <u>Viral Filtration Flux and Product Stability Study</u>".  Was never completed nor justified for
7   being open in 2006.  Those authors owning such open studies either ignored or
8   transferred or left AMGEN.

9

10   129.   The study results of such pre-approved studies were to be included and notified to the
11   FDA in their Annual Product evaluation as required by the FDA. Numerous such fact examples
12   are determined in the greater than 214 additional studies discovered by Relator in 2005 which
13   were left unattended in the discretely hidden FM Pro database, and some were removed illegally
14   upon Relator's notification to the Corporate Compliance Officer.  These studies were required to
15   assure the compliant manufacturing of filtered purified bulk ARANESP and EPOGEN.

16

17   130.   Relator's concerns for product safety and public harm when he uncovered the additional
18   backlog of validation protocols establishing non-conforming, adulterated products further
19   validates the real injury that occurred to those who paid high prices to purchase tainted
20   ARANESP and EPOGEN.  The consumers who relied on such ESA's to dramatically improve
21   their quality of life were in fact injured or suffered death.  An Adverse Event (AE) and Serious
22   Adverse Events (SAE) reports obtained[43] from the FDA validates the number of harmful issues
23   and events reported to the FDA by Healthcare professionals, patients, and others.

24       130.1  <u>The summary for ARANESP is as follows for the period stated so by the FDA</u>:
25   **ARANESP:**
26   Total Case reports for Adverse & Serious Adverse Events reported by Patients, Physicians, and
27   others from **Jan 2001 – March 2009 = <u>13,071 AE, SAE Reactions</u>**

---

[43]   **Source**: FDA's AE and SAE reports obtained from FDA under the Freedom of Information Act,
received by Relator in March 2009.

Total Death Outcomes by ARANESP: **Jan 2001 – March 2009 = <u>238 deaths</u>**

    130.2 <u>The summary for EPOGEN is as follows for the period stated so by the FDA:</u>

**<u>EPOGEN:</u>**

Total Case reports for Adverse & Serious Adverse Events reported by Patients, Physicians, and others from **November 1997 – March 2009 = <u>30,428 AE, SAE Reactions</u>**

Total Death Outcomes by EPOGEN: **November 1997 – March 2009 = <u>960 deaths</u>**

131.   Relator has knowledge that AMGEN negotiated with CMS and mis-represented that the AMP and BP would increase due to the fact that FDA compliance (45 day commitment) required resources, expertise and modern technology.  CMS has overpaid AMGEN on the manufacturing costs which AMGEN claimed it incurred in manufacturing ARANESP and EPOGEN with FDA constraints but did not actually expend such costs. AMGEN willfully adulterated and misbranded ARANESP and EPOGEN by taking unlawful shortcuts in manufacturing to overproduce and undermined quality by violating the terms of its Biological Licensing Agreements (BLA).

132.   In September 2005, Relator attended monthly meeting of the Metrics Management of the Validation Department of about 25 people, composed of everyone at the Colorado facilities who wrote and closed validation protocols.  Relator advised the group that he had discovered hundreds of protocols that had never been closed, at which point Wiseman got upset, interrupted him and hustled him out of the meeting and chewed him out affecting his future career.

133.   Even though Relator had informed Wiseman and O'Neill and were notified of the findings prior to this meeting. He was still subjected to humiliation publicly. Relator asked for a facilitator several times to avoid hostility from his managers, and was denied. Shortly thereafter, he was issued a CCD, for poor performance, and insubordination related to his insistence on reporting and disseminating awareness of the open protocols.

FCA Recovery Complaint                        50

134.   When reports of the additional open validation protocols (214) were discovered and reached the executive management levels, several of the executives reacted by disposing their stock options during November – December 2005.  AMGEN's CEO (Kevin Sharer) disposed over $300 million personal stock sale on or about November 8, 2005.  Others, in his circle followed similarly

135.   It is widely known in AMGEN Colorado, that secret video surveillance cameras are used in offices and conference rooms to monitor daily employee activities.  Relator provided his testimony and submitted factual events known at that time to the Security Exchange Commission (the "SEC") on or about January 2008.  The outcome of this investigation is unknown to Relator.

136.   On or about December 4, 2005 - AMGEN submitted a biologics license supplement (BLS) to the FDA for ARANESP dosing regimens for Chronic Kidney Disease (CKD) patients with anemia not on dialysis. The FDA requested additional clinical data for the once-monthly dosing regimen, including an additional clinical study. The backlog studies were cause for concerns adversely affecting this filing with the FDA (*See Paragraph 25 of this Complaint*). Relator's aging mother was considered a candidate for this study but did not enroll.

   136.1 <u>Fact example</u>: Study identified as AC20-C281-016 (Preapproved by AMGEN QA 3/13/2001), authored by Bob Weaver and Mark Meyers, titled as "<u>NESP Cell Culture Intra-batch Variability Study – Lots 33C008262 and 33C008263</u>" remained open in 2006 without justification or chain of custody data for completion.  The data elements may have been included in conducting this clinical trial while improperly seeking FDA approval for CKD indications.

137.   In December 2005, Relator made a formal complaint to the AMGEN diversity officer John Hudson and then Corporate Compliance Officer Tom Zindrick (See Exhibit P – Zindrick replaced), which was handled by Investigator Jeff Dyer who received full cooperation and details from him with no resolutions.

FCA Recovery Complaint                    51

*May's complaint concerned how he was treated by his supervisors and others at the Longmont facility, including the non-compliance activities and inaccurate management reports. Several studies of the 214 backlog open protocols were deleted or removed from the Validation Tracking Database as soon as Relator notified Zindrick.*

138.   Throughout 2005 and 2006, Relator's supervisors made numerous defamatory remarks regarding his competence and ability.  Not withstanding the harassing and unlawful retaliation in his department and Sensing the writing on the wall, and department restructuring, Relator was forced to move from the Longmont Colorado facility to AMGEN's corporate headquarters in Ventura County, California.

139.   He applied for a qualified position in another department at AMGEN Thousand Oaks, CA.  He was interviewed, consented to drug screening, passed background checks, and was offered a promotional position.  He accepted the new position and agreed on a start date of January 23, 2006.  This position specifically related to safety and compliance of ARANESP (Sure Click project) among other regulatory tasks.

140.   On or about January 10, 2006 – Relator was required to complete a transfer process wherein his new supervisor Tiffinie Butters was required to sign a release form. Instead, Butters contacted Marilyn Lozano (Human Resource Manager) and both of them intervened with Relator's prospective hiring manager and passed disparaging remarks blocking his transfer.

141.   The position was eventually withdrawn and filled by others. This continued retaliatory effort establishes a *prima facie* case of retaliation violating Colorado and California whistleblower protection statutes including FCA under § 3730(h).  The adverse actions of Butters and Lozano, and the inaction of AMGEN's management violated Relator's protected activity even when an FCA compliant was yet not filed.

FCA Recovery Complaint                         52

142.   Relator followed his internal AMGEN complaint with a formal complaint to Colorado Civil Rights Division (CCRD), which was accepted by the EEOC, in February 2006 as charge # 32A-2006-00312.   In March 2006, aware of the complaint to CCRD, AMGEN offered Relator a severance package and encouraged him to leave which he did not accept.

143.   Due to the extreme stress, un-bearable work environment, and unlawful actions from AMGEN managers and others, he was forced to take a medical leave from April 24, 2006 to May 29, 2006.  Upon his return, he learned that all his major duties had been re-assigned to others permanently.  He was forced by the stress, humiliation, harassment, and pressure to resign on June 2, 2006, which was a constructive discharge.

144.   On or about March through September 2007 – Relator voluntarily submitted details of the open protocol issues and other unlawful actions he experienced while at AMGEN to the FDA. Several interviews were conducted by FDA's compliance and advisory team members. Several issues surrounding AMGEN's Licensing (BLA) agreements and regulatory commitments to close all validation protocols within 45 days were analyzed and discussed.

145.   FDA officials required more information, and Relator continued to supply all available details impacting public health and safety concerns with ARANESP and EPOGEN manufacturing violations.  He freely and voluntarily provided applicable documents and information in his position enabling FDA's swift action to safeguard the use of ESA's eventually resulting in additional safety labels, Risk Evaluation and Mitigation Strategy (REMS), CMS payments, and congress passing the FDAAA[44] of 2007.

146.   It is clear from the facts that the whistleblower retaliatory conduct of AMGEN began once Relator discovered and reported the numerous discrepancies with the validation studies that could have resulted in serious consequences for AMGEN with the FDA and CMS.  These retaliatory and

---

[44]   Congress passed, and on September 27, 2007, United States President George W. Bush signed into law H.R. 3580, the Food and Drug Administration Amendments Act (FDAAA) of 2007.  This new law represents a very significant addition to FDA authority and also resulting in AMGEN REMS for ESAs.

FCA Recovery Complaint                                 53

1   harassing actions continued for almost a year beginning in July 2005, while blacklisting him until

2   he had no choice but terminate his employment with AMGEN.

3

4   # VIII. CAUSE OF ACTION

5

6   ## <u>COUNT 1</u>

7   False Claims Act 31 U.S.C. §§ 3729(a) (1), (a) (2), (a) (4), and (a) (5)

8   147.  Relator realleges and incorporates by reference herein the allegations contained in

9   paragraphs 1 through 146 of this complaint.

10

11   148.  This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§

12   3729, <u>et seq.</u>, as amended

13

14   149.  By virtue of the activities descried above, defendant AMGEN knowingly presented or

15   caused to be presented, false or fraudulent claims to the United States Government for payment or

16   approval of non-conforming or tainted ARANESP and EPOGEN products. This reverse claim is

17   subject to FCA recovery.

18

19   150.  As described in this Qui Tam complaint, defendant, by and through its officers, agents,

20   and employees or co-conspirators, or any combination thereof:

21       (i) Knowingly presented, or caused to be presented, to the United States Government, a

22       false or fraudulent claim for payment or approval for non-conforming, tainted, or

23       misbranded ARANESP and EPOGEN;

24       (ii) knowingly made, used, or caused to be made or used, a false record or statement to

25       get a false or fraudulent claim paid or approved by the Government for non-conforming

26       or tainted ARANESP and EPOGEN;

27       (iii) Knowingly made, used, or caused to be made or used, a false record or statement to

28       conceal, avoid, or decrease an obligation to pay or transmit money or property to the

29       Government.

FCA Recovery Complaint                    54

1      (iv) Knowingly has possession, custody, or control of property or money used, or to be

2      used by the Government and, intending to defraud the government or willfully to conceal

3      the property, delivers, or causes to be delivered, less property than the amount for which

4      the person receives a certificate or receipt (Quarterly Rebates owed to California).

5      (v) Has authorized to make or deliver a document certifying receipt of property used, or

6      to be used, by the Government and, intending to defraud the Government, makes or

7      delivers the receipt without completely knowing that the information on the receipt is true

8      by submitting inflated ASP/AMP/BP calculations to the CMS.

9

10  151.  Additionally, the FCA imposes liability for 'reverse claims;' so-called because rather than

11  making a claim for payment, the defendant makes a misrepresentation to the Government to

12  avoid or reduce a payment obligation[45]. This 'reverse claim' provision of the FCA is interpreted

13  to allow a plaintiff to recover from any person who "knowingly makes, uses or causes to be

14  made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or

15  transmit money or property to the Government. *31 U.S.C. § 3729(a) (7).*

16

17  152.  Relator cannot at this time identify all of the False Claims for payment that were caused

18  by defendant's conduct. The false or fraudulent claims were presented by thousands of separate

19  entities across the United States including wholesalers and retail class of pharmacies. He has no

20  control over or dealings with such entities and has no access to the records or contracts in their

21  possessions.

22

23  153.  The government unaware of the falsity of the manufacturing and validation records,

24  statements, and claims made or caused to be made by defendant paid the claims that would not

25  be paid but for defendant's illegal non-conforming or tainted ARANESP and EPOGEN products.

26

---

[45]  *See United States ex rel. Doe v. Dow, 343 F.3d 325, 329 (5th Cir. 2003)* (emphasis added).

FCA Recovery Complaint           55

154. The United States Government and the public fisc have been defrauded and damaged as a result of defendant AMGEN'S violations of FCA regulations resulting in substantial amount to be determined at trial.

## COUNT 2

### False Claims Act 31 U.S.C. §§ 3729 (b) (1) (2) or (3)

155. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 146 of this complaint.

156. AMGEN knowing and knowingly with respect to suspected non-conforming, adulterated, and misbranded ARANESP and EPOGEN made false statements to FDA investigators, the Secretary of Health and Human Services, and CMS administrators with respect to information

    (1) had actual knowledge of the non-conforming or tainted products information

    (2) acted in deliberate ignorance of the truth or falsity of the information; or

    (3) acted in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

157. Relator cannot at this time identify all of the harmed individuals, other than himself and his late mother that were caused by defendant's misconduct. The victims injured are those identified by the number of deaths reported to the FDA's adverse event tracking system by those who consumed the non-conforming ARANESP and EPOGEN formulations.

## COUNT 3

### False Claims Act 31 U.S.C. § 3729 (h)

158. Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 146 of this complaint.

159. Beginning in January 2004, and continuing to date of filing this complaint, Relator has taken actions to investigate the allegations set forth herein; to set the stage for the initiation of this lawsuit; and assisting the FDA investigators in mandating revised label changes for safe use

FCA Recovery Complaint                    56

1   of ARANESP and EPOGEN, and in preparing to disclose AMGEN's fraudulent actions to

2   appropriate government officials.

3

4   160.   On or about April through November 2005, after Relator voiced concerns for finding

5   additional hidden validation studies or protocols, he was given a 5 page written document

6   ("CCD") alleging insubordination, lack of ability to perform his duties, and other disparaging

7   remarks causing irreparable damage to his career and professional occupation, stripped of his

8   projects, and subjected to demotion.

9

10   161.   Relator's actions were fully lawful, and are protected actions of Relator pursuant to 31

11   U.S.C. § 3729 (h), the Federal False Claim Act's anti-retaliation action.

12

13   162.   Relator is the person who, at great risk to his career and professional reputation, reported

14   AMGEN's misconduct. Further, he suffered wholly improper and illegal retaliation for reporting

15   that misconduct.

16   COUNT 4

17   Cal. Gov't Code Sections §12650 - §12656, as applicable

18   §12650 (a) (1) (2) (A) (B) (C) (5), §12651 (a) (1) (2) (3) (4) (5) (7) (8), and §12653

19   (a) (b) (c) (d).

20

21   163.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1

22   through 146.

23

24   164.   By virtue of the acts described herein, defendant knowingly presented or caused

25   to be presented false or fraudulent claims to the California State Government for payment or

26   approval for non-conforming or tainted ARANESP and EPOGEN products.

27

28   165.   Defendant's conduct violated Government Code section 12651, subdivision (a) (8) as set

29   forth in this Count, and was a substantial factor in causing the State to sustain damages in

FCA Recovery Complaint                   57

an amount according to proof pursuant to California Government Code section 12651, Subdivision (a).

166.    By virtue of the acts described herein and above, defendant knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to the FDA, to induce the California State Government to approve and pay such false and fraudulent claims for non-conforming or tainted ARANESP and EPOGEN products.

167.    The California State Government, unaware of the falsity of the manufacturing violations records, statements and claims made to the FDA, used, presented or caused to be made, used or presented by defendant, paid for claims that would not be paid but for defendant's illegal manufacturing  practices and illegal off-label inducements.

168.    The California State Government, unaware of the inflated ASP/AMP/BP calculations reported to the Health Secretary remains to receive additional rebates from the defendant, for paying to ARANESP and EPOGEN claims submitted by State health insurance agents.

169.    By reason of the defendant's acts, the State of California has been damaged, in substantial amount to be determined at trial. The State of California is therefore entitled to recover from Defendant treble damages under the California FCA, in an amount to be proved at trial, plus a civil penalty of at least $5,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by AMGEN.

## COUNT 5
### CALIFORNIA Labor Code §1102.5 to 1105
### Employer interference with employee disclosures.
### §1102.5 (a) through (f)

170.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 146 of this complaint.

FCA Recovery Complaint                    58

171.  By virtue of the acts described herein and above, defendant knowingly interfered and retaliated with Relator's disclosures to Civil rights and EEOC government officials concerning the violations of state or federal statute or a violation or noncompliance with state or federal rule or regulation. Further, defendant retaliated against him for refusing to participate in an activity that resulted in a violation of the FDA and PHS Act regulations.

172.  On or about January 2006, Relator applied, offered, and accepted with his first assignment, another AMGEN position located in Thousand Oaks, California, but was then blocked from transferring to his new position by his managers and human resource manager.

173.  Labor code 1103 - Any employer who violates this chapter is guilty of a misdemeanor punishable, in the case of an individual, by imprisonment in the county jail not to exceed one year or a fine of not to exceed $1,000 or both and, in the case of a corporation, by a fine of not to exceed $5,000.

174.  Labor code 1104 - In all prosecutions under this chapter, the employer is responsible for the acts of his managers, officers, agents, and employees.

175.  Relator has been substantially injured from defendant's unlawful actions and seeks to recover damages for the injury suffered to be determined at trial.

## COUNT 6
### COLORADO Whistleblower Laws
### Colo. Rev. Stat §24-114- 102, et. seq.

176.  Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 146 of this complaint

177.  Relator objected to defendant's violations of the public policy statute established by Colorado whistleblower laws, specifically, that the action directed by the defendant would

FCA Recovery Complaint                    59

1   violate a specific statute relating to the public health, safety, or welfare, or would undermine a

2   clearly expressed public policy relating to the Relator's basic responsibility as a citizen or his

3   right or privilege as a worker; and  that the Relator was terminated as the result of refusing to

4   perform the act directed by the AMGEN.

6   178.   Relator was discharged with constructive termination while objecting to public policy

7   violations and Retaliation for Exercising a Specific Statutory Right or Duty under Colorado Law

8   in protecting whistle blower statutes.

10   179.   Relator took a short term medical leave of absence to recover from the harassing and

11   emotional pain and suffering caused by AMGEN managers. Upon his return his projects were

12   terminated and his replacement was then assigned to his work load. Relator was then offered a

13   severance package and urged to leave of which he did not accept and eventually resulted in

14   constructive discharge.

16   180.   Relator has been substantially injured from defendant's unlawful actions and seeks to

17   recover damages for the injury suffered to be determined at trial.

19                                    COUNT 7

20   Federal Food, Drug, and Cosmetic Act (FDCA) 21 CFR Parts 210, 211, 11

21                  21 CFR Part 600-680, where applicable

22   181.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1

23   through 146 of this complaint.

25   182.   In addition to requirements in 21 CFR 601.12 and 314.70(g), AMGEN when making a

26   change to an approved application must conform several applicable laws and regulations,

27   including the current good manufacturing practice (CGMP) requirements FDCA - 21 U.S.C.

28   351(a) (2) (B)) and applicable regulations in 21 CFR parts 210, 211, 600 through 680, and 21

29   CFR Part 11 – Electronic records.

FCA Recovery Complaint                     60